Original

(AO 243/(Rev. 5/85))

MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

C 05 1015

# United States District Court

| District |
| EASTERN DISTRICT OF NEW YORK |

| Name of Movant | Prisoner No. | Case No. |
| JULIUS R. NASSO | 67923-053 | 02-CR-606 |

| Place of Confinement |
| FEDERAL CORRECTIONAL INSTITUTION, ELKTON, OHIO |

UNITED STATES OF AMERICA     V.     JULIUS R. NASSO    **BLOCK, J.**
(name under which convicted)

## MOTION

**POHORELSKY, M.J.**

1. Name and location of court which entered the judgment of conviction under attack __United States__

   __District Court, for the Eastern District of New York__

2. Date of judgment of conviction __February 17, 2004__

3. Length of sentence __12 months and 1 day__

4. Nature of offense involved (all counts) __Charged as conspiracy to violate Title__

   __18 United States Code § 1951__

5. What was your plea? (Check one)
   - (a) Not guilty ☐
   - (b) Guilty ☒
   - (c) Nolo contendere ☐

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   __Count 59 was dismissed__

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   - (a) Jury ☐
   - (b) Judge only ☐   N/A

7. Did you testify at the trial?
   Yes ☐ No ☐    N/A

8. Did you appeal from the judgment of conviction?
   Yes ☐ No ☒

RECEIVED
FEB 2 2 2005
PRO SE OFFICE

(2)

9. If you did appeal, answer the following:

(a) Name of court _____ N/A _____

(b) Result _____ N/A _____

(c) Date of result _____ N/A _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

(a)(1) Name of court  U.S. District Court, Eastern District of New York

(2) Nature of proceeding  Administrative

(3) Grounds raised Government abuse and misconduct  [Failure to follow Court's Order regarding mental health treatment and Placement in appropriate facility; Improper maintenance of records and unlawful disclosures]  Deliberate Indifference that nearly killed Movant.

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☒

(5) Result  Denied without prejudice to renewal

(6) Date of result  December 2004.

(b) As to any second petition, application or motion give the same information:

(1) Name of court  _____ N/A _____

(2) Nature of proceeding  _____ N/A _____

_____ N/A _____

(3) Grounds raised_____

_____

_____

_____

_____

(3)

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐ No ☐

(5) Result_____ N/A _____

(6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?
(1) First petition, etc.        Yes ☐ No ☒
(2) Second petition, etc.       Yes ☐ No ☒

(d) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

Recently obtained information indicating material perjury was
used by Government to induce plea

Events relative to prison abuse, Misconduct, and erroneous
record keeping occurred after arrival at prison and after
expiration of time to file an appeal.

Prior records and files are incorporated with judicial Notice
requested of the CLEAR & PRESENT danger resulting from gross
medical negligent acts, directly in conflict with this Court's
Orders.

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize briefly the facts supporting each ground. If necessary, you may attach pages stating additional grounds and facts supporting same.

CAUTION: If you fail to set forth all ground in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence gained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impanelled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: New information shows material perjury was used to obtain Petitioner's indictment

Supporting FACTS (state *briefly* without citing cases or law) Petitioner attaches a copy of case # BC-316318 (EXHIBIT "A") incorporated herein as fully set forth. Mr. Pallicano was hired by Steven Segal or by Someone on Segal's behalf to frame Petitioner. The Motive for the "frame up" was Patitioner's civil action, filed against Steven Segal in March 2002. In or about April 2002, the perjury was used in Grand Jury proceedings & before the D.O.J..

B. Ground two: Sentencing statute under which Court used is facially Repugnant and unconstitutional.

Supporting FACTS (state *briefly* without citing cases or law): On January 12, 2005, The Supreme Court declared a part of the Sentencing Reform Act to be Unconstitutional. At sentencing, in February 2004, probation was recommended by the probation department. [See supporting memorandum incorporated as if fully set forth]

C. Ground three. Government's material breach of agreement and direct disregard of Court's Order for Medical & Psychiatric treatment and other misconduct.

Supporting FACTS (state *briefly* without citing cases or law): As part of the plea, the Court Ordered mental health and proper medical care at sentencing. The Government and the BOP did not perform as ordered. In fact, Movent's life was endangered [intentionally] by FCI Elkton staff. This claim will be ripe in approximately 20-30 days, as administrative remedies will be exhausted. The Administrative

record is incorporated and provided as a CONSOLIDATED EXHIBIT "C".

D. Ground four: _____

_____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them: Information is recently discovered; The BOP actions occurred after surrender to prison; The Supreme Court's decision is newly rendered. Administrative Claim is about to be ripe for decision- See also 28 C.F.R. §40.8. Petitioner requests leave to supplement this request as the fact warrant.

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?
Yes ☐ No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing HANTMAN & ASSOCIATES, 432 Park Avenue-South
2nd Floor, New York, New York, 10016

(b) At arraignment and plea
SAME

(c) At trial
N/A

(d) At sentencing
SAME

(e) On appeal _____ N/A _____

_____

(f) In any post-conviction proceeding _____ N/A _____

_____

(g) On appeal from any adverse ruling in a post-conviction proceeding _____ N/A _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?
Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒   Probation of 12 months

(a) If so, give name and location of court which imposed sentence to be served in the future: _____ SAME _____

_____

_____

(b) Give date and length of the above sentence: _____ 12 months probation _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Pro se Signature ~~of Attorney~~ (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed pursuant to title 28 USC §1746.

February 15, 2005
(date)

_____
Signature of Movant

## SUPPLEMENTAL MEMORANDUM FOR $ 2255 MOTION

Petitioner asks the Court to consider the special circumstances for modification of his sentences imposed by this Court pursuant to a disposition under Fed.R. Crim. P.11(e)(1)(C). Accord, Title 18 U.S.C. $ 3582(c)(2) & Fed.R.Civ.P. 60(b) et seq,

**AS GROUNDS FOR THE GRANTING OF THIS REQUEST, PETITIONER SHOWS THE FOLLOWING SPECIAL CIRCUMSTANCES; BUT NOT EXPRESSLY LIMITED THERETO:**

1    On or about August 13, 2003, Movant entered a plea of guilty as advised by counsel. On February 17, 2004, the Court accepted the plea. *A true copy of the sentencing transcript is provided herewith as Exhibit B.*

2.    On January 12, 2005, the Supreme Court of the United States declared that the Sentencing Reform Act was found to be, in part, facially unconstitutional. *Please see **U.S. v Booker/Fanfan, 124 S.Ct 738 (2005).***

3.    At sentencing, the Court was concerned with the specific require-ments of the Federal Sentencing Guidelines and their mandatory nature. However, it is clear at this time that the Court was laboring under a mistaken impression that it had to impose a sentence within the guideline range which it thought to be 33-41 months using the PSR or plea contract.

4.    The Court is also respectfully reminded that the U.S. Probation Department recommended and found that this Defendant was a prime candidate for probation. *See presentence report. See also sentence record at page 37.*

5.    At sentencing the District Court concluded that the relevant offense range level was 33-41 months. This was a result of numerous artifical increases. See for example, the plea term regarding $3+million dollars. This particular amount or claim was rejected by the Court. It is suggested that in part the terms can be reviewed because it was in all probability, highly inaccurate as the court indicated. Other records indicate that Defendant had loaned Steven Seagal $500,000 at 6% interest. The principal and interest remains due.  A true copy of Defendant's civil action filed against Steven Seagal showing these monies are due and owing is a matter of public record, *Case No. 10940,* *filed in the state of New York. A copy will be forwarded.*

1

6.    Written objections were made by Applicant through Counsel preserv-
ing the objection for denovo review and correction, notwithstanding the claims
made by "the office". *See page 11-12 of sentencing transcripts.* No amount
enhancement should have been applied. Id page 41 shows the objection was pre-
served.

7.    The discussion as to the facts regarding the amounts can be found
at page 11 & 30, and elsewhere in the February 17, 2004,  sentencing record.
 The Judge specifically found there was no proof for any of the amounts, but stated
at trial... " they were talking about getting him to pay $700,000.".  If true,  there
is also the likelihood of **actual innocence** regarding this so-called "loss allegation
or guideline amount claim".   Judicial notice requested. The record shows:

" But, I don't find that there's a real  strong basis to support a seven level or six
level increase..."  **he could have told them $10 zillion... "**
Thereby,  indicating  there is nothing to support the claimed amount thereby impli-
cating rights and responsibilities under Fed.R.Crm.P. 32.

       The Petitioner has reason to believe erroneous or mistaken information was
used, he therefore,  Plaintiff realleges and asserts Ground One as fully stated herein.
That is,  **IF** the new information shows material perjury was used to obtain Petitioner's
indictment,  he is probably entitled to relief by modification of the sentence  suggested
here to implicate the interests of justice. *Strong Likelihood of a probationary sen-
tence. I.e., cause and prejudice is shown as suggesteed here.*

## NEWLY DISCOVERED EVIDENCE / INFORMATION

8.    Plaintiff offers,  **Exhibit A, Case No. BC316318,** filed on May 4, 2004.
This exhibit shows  Anthony Pellicano is named as a Defendant in the civil action
filed by Anita Busch.  Future discovery will show Steven Seagal may have hired
Mr. Pellicano to frame movant.   By doing this, they believed the civil claim against
Seagal would disappear.  Movant's action was filed in the state of New York, claim-
ing damages and injury to Movant's business and property interests. *A true copy of*

2

that public record will be forwarded to this Court in the very near future.
The facts will show within 30-60 days of the filing of Petitioner's civil action,
Steven Seagal engaged in a course of conduct and a pattern of activity that indi-
cates he may have used the United States Attorney's office for the Eastern District
of New York, to cause Movant to be indicted on Mr. Seagal's materially false testi-
mony before the federal officials and later, the Federal Grand Jury which will,
Petitioner suggest, will be good cause to modify or reduce the sentence.*

      9.      On January 12, 2005, the Supreme Court also ruled that judicial-fact-
finding that increases a Defendant's base offense level violates the Sixth Amend-
ment to the Federal Constitution. While this violation cannot rightly be attributed
to the Court, it is, however,  suggested that inaccurate information was used. E.g.,
a 2.5 -3 milllion dollar amount was claimed.   This term was made ostensibly for
the purposes of the guidelines.  This court knows that figure was and is inaccurate.  It
was opposed by both Defendants, Julius and Vincent Nasso, at sentencing.  Again,
this Court stated;

" He could have told them 10 zillion..."  *Id. at 31, Exhibit B.*  Additional proof and
the record  inconsistency is found in Mr. Vincent Nasso's sentencing hearing with the
objection being made by Mr. Levin (Counsel for Vincent).

See discussion as to changing the fine to restitution of approximately $250,000.  *Id at 80.*
The Court is requested to judicially notice this inconsistency and give the Defen-
dants the benefit of the ambiguity notwithstanding that provision of the plea
contract.  Because this number,  2.5 million was,  in effect, used to drive the
sentencing increases and create an artificially high  guideline range;  the Court can
reconsider this part and specifically and find it entirely unsupportable by the record.

---

* The Court is requested to construe this information as newly discovered and will be more
fully developed in the near future showing good cause why a hearing should be had.

3

It is suggested that using an enhancement for these purposes is unjust.   Whereas, this Court previously instructed that it could have a hearing with regard to where this 3 million dollar figure came from.  Id at 30-31.  To wit:

> "THE COURT: They wanted him to pay $3 million? I heard $700,000.
> During the course of the trial. I could have some recollection of that.
> I could have a hearing. But I don't find that there's a real strong basis
> to support a seven level or a six level increase. I find based upon what
> I heard during the trial, that fairness suggests that what happened here
> consistent with the Jules Nasso plea agreement is that he was claim
> ing, that, you know, Seagal owed him $700,000. And that, you know,
> he reached out to his brother to sort of get somebody to threaten him
> to pay the money. I recall $700,000 being the trigger."
>
> *and on page 33, Mr. Hantman; Nasso's Counsel,* "...[A]nd that would
> support the lower base level, your Honor. And again, we are not here
> trying to take exception to the agreed upon plea agreement with the
> government. We merely want to convince the Court that the plea is
> a bona fide plea."

Defendant, allocuted as follows before Judge Pohorelsky:

" I participated in conversations as recorded on surveillance tapes in regard to obtaining assistance involving a business dispute with my partner, Steven Seagal. Such disputes stem from my claim that there was money owing to me from Steven Seagal."

10.    The record shows on page 35 of the sentencing transcript, the Court was upset with Defendant because he did not bring civil litigation for the purpose of collecting the monies owing him from Seagal.  However, prior to being indicted, Defendant did file a civil action or breach of contract, bad faith,  and for other monies loaned  to Mr. Seagal which to this day remain owed to Defendant.  What appears to have been overlooked by the Sentencing Judge was the fact that Defen-dant did file his civil action against Seagal.  Precisely as the Court said that he should have done.  The Court may review this Civil  action in camera.

4

11. Defendant has reason to believe exculpatory information may be available. This information is believed to be recorded conversations. Discovery of exculpatory information that implicates a mistake of fact or other error that could be reviewed denovo by this Court with no prejudice to the government. It to has an interest in seeing that there is no injustice. This is suggested if shown would meet the necessary legal standard of cause and prejudice for the granting of relief.

12. New discovery could be viewed to be an additional special circumstance and grounds for this Court to relieve the Defendant from his sentence of imprisonment. If so, the Court can reduce or modify the sentence on a finding exculpatory information. If Defendant's assertions are true; that earlier taped recorded conversations could show a manifest injustice by any further incarceration in addition to the other good cause shown here on the deliberate indifference or medical negligence suggesting there is good cause to modify the sentence forthwith.

### ARTIFICIAL SENTENCING INCREASE

13. On page 37 of the transcript, Counsel asks the Court for permission to work out some of these issues...referring to the guideline which Defendant hereby suggests would never have been as high but for the artificial increase on the inaccurate information. Court was particularly concerned with the disparity and how to justify it. In fact, Counsel argued for an urged a sentence of probation.

To wit:       MR. HANTMAN: " Your Honor, if we could have.. your Honor, it's exactly for these reasons why we wanted an adjournment to try to work out some of these issues because frankly, we believe that the guideline should be so far lowered that even within the guidelines, Mr. Nasso would be entitles to probation.

THE COURT: " That would be a different cup of tea. I'm looking at a significant disparity here and that troubles me.

5

Had the Court been properly informed and aware it had discretion to impose the probationary sentence, it is highly probable that he would have. But for the Court's misunderstanding that the guidelines are not mandatory. This is the case as was recently ruled in **US v Booker, 125.S.Ct. 738 , (2005).** Clearly, this is "*the different cup of tea*" the Court referred to which gives it discretion it thought it did not posess. This alone is sufficient cause for the Court to revisit the sentence imposed in this matter and issue an amended judgement forthwith imposing a probationary term.

> "A Defendant's knowing involuntary waiver, as part of a plea agreement, of his right to appeal or bring " any collateral attack" does not extend to his right to move for modification of his sentence under 18USC $ 3582 (c) (2), the U.S. Court of Appeals for the 10 Circuit ruled in July 29. Neither the language of the plea agreement nor the District Court's plea colloquy clearly informed the Defendant that his waiver was intended to include Motions under $ 3582. US v Chavez-Salais, 10 Circuit No. 022138, 2003.

14.    Assuming  arguendo,the Court finds any potential waiver of appeal or collateral attack rights to be valid, the Court is requested to consider an additional basis for extraordinary or special circumstances that fall within Title 18 U.S. Code Section 3582 (c)(2).  The Court sua sponte has the authority to gant this request pursuant to it's statutory authorization under this federal statute.   It is not believed that the government will suffer any prejudice as a result of the granting of  this request to set  aside or modify the sentence.   Such an unusual circumstance as the U.S. Supreme Court having declared a part of the Sentencing Reform Act as being facially unconstitutional is good cause for the court to consider the effect of how it may have ruled on the Probation Officer's Recommendation for propation had it known it could have imposed such a sentence under it's discretionary power and the relevant "factors". applicable to this Defendant.

6

15.    Movant suggests that the waivers, if the Court finds them currently valid and enforcable, can rule the same to be void or voidable in the interest of justice. *See also Santobello v New York, 404 U.S. 257 (1971).*    That is such a waiver as implicated in light of the repugnancy ot the sentencing statute could impugne an otherwise void sentence or allow it to be reconsidered.

16.    Moreover, because the court and the parties were laboring under the mistaken assumption based upon an invalid sentencing statute t he Court has discretion and can revisit the sentence. *See the Court's prior citation and sentencing transcripts; U.S. v Goodall, 236 F.3rd page 700, ( DC Cir. 2001).*

The Court thought it was bound to use the Probation Officer's Report stating an offense level 24 based on paragraph No.244, using a $63 million dollar number which the Court appears to have disregarded. *Id at page 27.*

17.    Clearly, the record indicates the Court thought this was problematic and, indeed, it is. The mistaken notion that a probationary sentence could not be imposed is at least arguably somethint that this Court can consider at this time with little or no prejudice at all to the governent or the terms of the plea in light of the recent rulings. It is indeed possible that the government will not oppose the sentencing modification. The base offense level can be reevaluated without prejudice to the agreement and if a substantially lessor sentence or a probation-ary sentence would have been imposed would allow the Court to modify the sentence; a sentence that probably would have been probation.

7

19.      Clearly, the Sentencing Commission could not have taken into consideration the fact that the Congressional provisions or the part of the Sentencing Reform Act was constitutionally repugnant. This is good cause and grounds to be relieved in some part from some of the terms or conditions or for the modification and reduction of   Defendant's sentence to probation which he requests at this time.   Consideration of these factors was unavailable at the time of sentencing because the Supreme Court had not ruled on the recent decisions.   These new decisions have  had a profound effect on the sentencing guidelines. These new rulings  allow this Court to revisit and modify this sentence.

20.      In **U.S. v  Chavez-Salais**, the Court determined that there is and was no basis to construe a plea agrement to have waived the $ 3582 rights.  Further, there could not be such a waiver because the Court on it's own motion can con- sider and review denovo such a claim in the context of  the statute. The government  will suffer no prejudice as a result of the granting of this request and such considderation is suggested to warrant relief.

21.      Because the request  here to modify the sentence, pursuant to subsequent abuse,  negligence or deliberate indifference, is also good legal cause and special circumstances there is additional reason for this reconsideration  and or  application of this Court's higented scrutiny.

 The increases in the guideline range using mistaken or inaccurate information may also implicate provisions of Fed.R. Crim.P. 32. The context and language of Title 18 USC $ 3582., is suggested to give the court considerable latitude in framing relief  and in reviewing the request favorably.      Review of some of the provisions of  the agreement are suggested warranted and  t he Court per se is entitled to sua sponte review on it's own  motion. It can avert a  potential miscarriage which involves abberant behaviour as concluded by the  existing record.    Because the    ·Court was  laboring under a misconcep- tion of  the Guidelines at that time .   It is there fore reasoable for the Court to excuse the defendant from suffering further execution of  judgment .  See For example, Fed.R.Civ.P. 60(b) et seq., and  specifically 60 (b)(6) , with the Court's inherent powers.

8

## MATERIAL BREACH AND CLEAR AND PRESENT DANGER

22.    Petitioner incorporates his prior $2255 Motion and  paragraphs 1-21  herein as though fully set forth.

23.    Events occurring after Petitioner's surrender to the Federal Bureau of Prisons indicate the government's misconduct and a material breach of the duty and obligation or a deliberate disregard to provide  adequate medical and mental health treatment.

24.    A recent MRI scan shows that this Defendant had a stroke a few weeks after his arrival in FCI Elkton, Ohio, on November 20, 2004.  This stroke was not treated for more than three months.

25.    These facts suggest medical negligence and/or malpractice.  The fact that Petitioner was placed in the Segregated Housing Unit for no reason after having this stroke, and the consequent lack of mobility placed  his life, and health in serious peril.

26.    The above stated facts demonstrates a  callous disregard for the rights and treatment of prisoners.  Movant asks that the court make a finding of deliberate indifference within the context of **Wilson v. Seiter,**   U.S.     (1993). He also suggests imposition of the appropriate sanction or other remedy which will allow this Movant to attend to his own medical needs.

27.    Movant requests judicial notice of his medical file.  He especially asks the Court to review the recent MRI scan  and relevant medical information which show the results that he had a stroke .  Judicial notice is requested that Movant had a  stroke that was not treated timely or properly.

9

28.     The manner in which the Movant has been treated by the prison's officials shows a clear and present danger.  In execution of this Sentence, this Petitioner has suffered abuse, both mental and physical, extreme degredation and humiliation from the moment he arrived at FCI Elkton.

29.     Other facts and prison records show that on or about August 20, 2004, prison officials tricked him into checking himself into segregation by ruse and artifice. The facts and details of this abuse is shown in the Petitioner's Affidavit and Supporting Administrative Record that is a matter of record with this Court and is incorporated again as fully set forth.  Movant also incorporates the Affidavit of David L. Ries which is also provided to support this application.

While the prison staff and, perhaps, even the Warden,  find their little escapades amusing, this Applicant was at the time taking strong medication.  Moreover, the fact that being sedentary with the consequent lack of mobility within the segregated housing unit *(the hole);* the prison officials endangered his life.  This is because of the potential for blood clotting which can cause strokes or death.

30.     Notice is requested that being sedentary is dangerous to one's health. Recently, the death of a famous journalist who was in his 40's, which resulted from sitting in the jeep he was traveling in for three days while with U.S. forces in Iraq corroborates this claim. It may be the kind of fact that is adjudicatory in nature.

31.     The pattern of negligence and abuse suffered by this prisoner includes, but is not limited to, having served nearly three additional months in segregated housing from November 8, 2004, to January 19, 2005.  This placement in the " hole " was without compliance to any of the mandatory regulations which limits the discretion of the Federal Bureau of Prisons, which requires the issuance of an Incident Report BEFORE one is placed in segregation. An Incident Report is commonly referred to as a SHOT.  *Please see 28 U.A.C $541.14 (a) and the construction of that Federal Regulations in **Tellier v Fields**, 234 F3rd      (2nd Cir. 2002).*

Movant requests that the Court judicially notice the lack of compliance with the Federal Regulation and asks that the Court considers the pattern of abuse and negligence by the FCI Elkton staff who have placed this Applicant's life in peril by their habitual abuse and neglect.

This is a clear and present danger which this Court should construe as good cause for service of the remainer of any potentially valid sentence on home confinement or

32.    Applicant suggests these facts, in addition to the foregoing special cir- cumstances, justify Movant's request for consideration to have his sentence modified to probtion or time served.   He shows additional special cause because of the violation of the prison employee's duty to humane treatment of prisoners.

These additional facts are established beyond any reasonable doubt by the prison's records which are requested to be considered as a ground for a finding that there was a serious disregard for the special medical needs of this defendant which was incorpo- rated in the Court's judgment by recommendation.   Petitioner did not waive his right to humane treatment.   Such abuse is requested to be found as against public policy and as a clear and presente danger to this Applicant.

## CONCLUSION

For the foregoing reasons the Movant request that this Court:

1.    Grant an evidentuary hearing.

2.    Set aside the judgment with a finding that it should have no further prospective value and/or for immediate issuance of an amended judgment to a probationary term or to time served.  (In Nature of a finding under Fed.R.Civ.P. 60(b) et se., or the Court's inherent authority.

3.    Order an appointment of a special Master to look into the unlawful investigation detention practices engaged by Bureau of Prisons officials done under color of authority at FCI Elkton, Ohio if warranted by the facts.

11

5.    Make findings and conclusions with respect to the medical negligence and medical malpractice alleged and indicated in the administrative record with the issuance of an appropriate order for appoint ment of competent medical examiner to review movant's s medical file.

6.    Applicant asks for any other and further relief the Court deems proper including ordering discovery or other proper remedy.

Date: February 15, 2005

Respectfully Submitted,

Julius R. Nasso  No. 67923-053
FCI Elkton P.O. Box 10
Lisbon, Ohio 44432
Pro Se

Verification

I, the undersigned declared under the penalty of perjury foregoing is true and correct, to the best of my knowledge, information, and belief. This affirmation is executed pursuant to Title 28 USC $1746. It was made at FCI Elkton, Ohio on this  day of February, 2005.

Julius R. Nasso  No. 67923-053

12

# EXHIBIT A

Case 1:05-cv-01015-FB   Document 1   Filed 02/24/05   Page 20 of 60 PageID #: 22

| | |
|---|---|
| 1   GERAGOS & GERAGOS<br>2   MATTHEW J. GERAGOS   SBN 153390<br>     SHELLEY KAUFMAN     SBN 100696<br>3   350 S. Grand Avenue, 39th Floor<br>     Los Angeles, CA 90071-3480<br>4   Telephone:   (213) 625-3900<br>     Facsimile:    (213) 615-1600<br>5   KABATECK & GARRIS<br>6   BRIAN S. KABATECK    SBN 152054<br>     350 S. Grand Ave., 39th Floor<br>7   Los Angeles, CA 90071-3480<br>     Telephone:   (213) 217-5000<br>8   Facsimile:    (213) 217-5010 | CONFORMED COPY<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>MAY 2 8 2004<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>        SUE GABB |

```
 1   GERAGOS & GERAGOS
 2   MATTHEW J. GERAGOS   SBN 153390
     SHELLEY KAUFMAN     SBN 100696
 3   350 S. Grand Avenue, 39th Floor
     Los Angeles, CA 90071-3480
 4   Telephone:  (213) 625-3900
     Facsimile:  (213) 615-1600

 5   KABATECK & GARRIS
 6   BRIAN S. KABATECK   SBN 152054
     350 S. Grand Ave., 39th Floor
 7   Los Angeles, CA 90071-3480
     Telephone:  (213) 217-5000
 8   Facsimile:  (213) 217-5010

 9   Attorneys for Plaintiff ANITA BUSCH

10           SUPERIOR COURT OF THE STATE OF CALIFORNIA

11               FOR THE COUNTY OF LOS ANGELES

12

13   ANITA BUSCH,                    Case No.  BC 316318

14            Plaintiff,
                                     Complaint for:
15       vs.
                                     1. Intentional Infliction of Emotional
16   ANTHONY PELLICANO; ALEXANDER       Distress
     PROCTOR; MARK ARNESON; CITY OF LOS 2. Assault
17   ANGELES; SBC TELECOMMUNICATIONS,   3. Invasion of Privacy
     INC., formerly operating as Pacific Bell 4. Violation of Statute - Penal Code
18   Telephone Company, a corporation;    §§632 and 637.2
     CLIENT DOE; LAW FIRM DOE; and    5. Violation of California Business
19   DOES 1 through 100, inclusive,      & Profession §17200
                                     6. Negligence
20            Defendants.            7. Negligence

21                                   Demand for Jury Trial

22       Plaintiff alleges:

23                      INTRODUCTION

24       1.   This case involves a well-known journalist who was working on high profile

25   stories regarding various business dealings of several entertainment figures.  Threats and

26   assaults on Plaintiff's life traumatized her and brought her illustrious career to a halt.  Behind

27   these threats and attacks is the well known private investigator Anthony Pellicano, along with

28   his clients, and a ring of co-conspirators, including Mark Arneson, a twenty-nine year
```

GERAGOS & GERAGOS
Lawyers

COMPLAINT

EXHIBIT "A"

Case 1:05-cv-01015-FB   Document 1   Filed 02/24/05   Page 21 of 60 PageID #: 23

1  veteran of the Los Angeles Police Department Robbery/Homicide division, who were

2  directing and leading the plan of attack.

### THE PARTIES

4      2.      Plaintiff ANITA BUSCH is a resident of the County of Los Angeles, State of

5  California.  At all times herein mentioned, Plaintiff was a journalist, who was writing

6  investigating and reporting on entertainment business stories for newspapers.  She worked

7  for The New York Times until May 2002 and then starting working for The Los Angeles

8  Times thereafter.

9      3.      At all times herein mentioned, Defendant ANTHONY PELLICANO

10  ("Pellicano") was a resident of the County of Los Angeles, State of California.  Defendant

11  Pellicano is sued herein for acts he personally committed and as a co-conspirator who, at the

12  direction of CLIENT DOE, LAW FIRM DOE and Does 1 through 31, acted to cause harm

13  and injury to Plaintiff, to instill fear and apprehension and to illegally and unlawfully invade

14  her privacy.

15      4.      At all times herein mentioned, Defendant ALEXANDER PROCTOR

16  ("Proctor") was a resident of the County of Los Angeles, State of California.  Defendant

17  Proctor is sued herein for acts he personally committed as well as a co-conspirator who, at

18  the direction of Defendant Pellicano and Does 1 through 31 acted to cause harm and injury

19  to Plaintiff, to instill fear and apprehension and to illegally and unlawfully invade her

20  privacy.

21      5.      At all times herein mentioned, Plaintiff is informed and believes and thereon

22  alleges that Defendant MARK ARNESON ("Arneson") at all times relevant herein was a

23  resident of the County of Los Angeles, State of California.  In doing the acts hereinbelow

24  alleged, Arneson was employed by the City of Los Angeles as a police officer with the Los

25  Angeles Police Department ("LAPD.")  Plaintiff is informed and believes and thereon alleges

26  that Defendant Arneson obtained and accessed private privileged information about Plaintiff

27  through his resources as a police officer and was part of the conspiracy to cause and instill

28  fear and apprehension and cause harm and injury to Plaintiff.

GERAGOS & GERAGOS
Lawyers

COMPLAINT

6. At all times herein mentioned Defendant CITY OF LOS ANGELES was a governmental entity organized and existing under the laws of the State of California. The City of Los Angeles was the employer of Defendant Arneson and unknown DOE defendants Does 54 through 64. On June 4, 2003, Plaintiff first discovered that Defendant Arneson was involved in obtaining privileged and confidential information about Plaintiff and being involved in the conspiracy to harm her. Plaintiff thereafter timely filed a claim with the City of Los Angeles on December 3, 2003. That claim was denied on December 17, 2003; this complaint is therefore timely filed.

7. At all times herein mentioned, Defendant SBC TELECOMMUNICATIONS INC., formerly operating as Pacific Bell Telephone Company, collectively referred to herein as "SBC" is a corporation, doing business principally in the State of California and with a principal place of business in the State of California.

8. Defendants DOES 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff at this time. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by those defendants. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant refers also to all defendants sued under fictitious names.

9. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants, including all defendants sued under fictitious names, was the agent and employee of each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the course and scope of this agency or employment.

10. Defendants CLIENT DOE, LAW FIRM DOE and Does 1 through 31, are not yet known persons and/or entities who were involved in directing, organizing, commanding, employing and/or hiring individuals to engage in the unlawful and tortious conduct alleged

3
COMPLAINT

---

1  herein. Said Does 1 through 31, acted in concert and conspired with the remaining
2  defendants to cause the harms to Plaintiff alleged herein.
3      11. Defendants Does 1 through 31, are not yet known persons and/or entities who
4  engaged in the pattern and scheme of harassment, threats and intimidation, including causing
5  direct threats and assaults on Plaintiff.
6      12. Defendants Does 32 though 42, are not yet known persons and/or entities who
7  engaged in the pattern and scheme of unlawful and illegal conduct by participating
8  causing, creating and/or engaging in illegal wiretapping of Plaintiff's telephone lines and
9  the purposes of later causing harm and injury to Plaintiff, as well as invading the privacy
10  Plaintiff.
11      13. Defendants Does 43 through 53, are not yet known persons and/or entities who
12  were employees, independent contractors and/or agents of Defendant SBC and who
13  participated in, caused, created and/or engaged in illegal wiretapping of Plaintiff's telephone
14  lines and for the purposes of later causing harm and injury to Plaintiff, as well as invading
15  the privacy of Plaintiff.
16      14. Defendants Does 54 through 64, are not yet known persons who were
17  employees, independent contractors and/or agents of Defendant City of Los Angeles an
18  were who participated in, caused, created and/or engaged in illegal retrieving of person
19  information about Plaintiff, illegal wiretapping of Plaintiff's telephone lines, cond
20  harassment and intimidation, who participated in, caused, created and/or conspired to cau
21  harm and injury to Plaintiff, as well as invade the privacy of Plaintiff.
22      15. Defendants Does 65 through 100, are not yet known persons and/or entities
23  whose involvement in the alleged conduct is not yet identified or known. Plaintiff
24  informed and believes that these unknown defendants were in some way responsible for
25  harm and injuries caused to Plaintiff.
26      16. Defendants Does 1 through 100, inclusive, acted in concerned and conspi
27  with Defendants Pellicano, Proctor and Arneson to cause the damages and injuries
28  Plaintiff as herein alleged below.

4
COMPLAINT

Case 2:05-cv-01515-FB   Document 1   Filed 02/24/05   Page 23 of 60 PageID #: 25

## GENERAL FACTUAL ALLEGATIONS

17. The claims against known Defendants and the presently unknown Defendant described herein arise out of the Defendants Pellicano, Proctor, Arneson and Does 1 throug 100, intentionally and maliciously engaging in a scheme and course of conduct of threats intimidation, harassment and invasion of privacy against Plaintiff for investigating and writing articles about th preventing and retaliating against Plaintiff for the purpose of deterring, hindering entertainment business.

18. The ongoing pattern and course of conduct engaged in by Defendants, and each of them, at the instigation of CLIENT DOE, LAW FIRM DOE and Does 1 through 31 includes the following:

(a) Wiretapping of Plaintiff's telephone lines. The date of commencement o said illegal wiretapping is not yet known; however, Plaintiff only became aware of illega wiretapping within the past two years;

(b) On or about June 20, 2002, at Plaintiff's residence in Los Angeles California, Plaintiff was threatened, harassed and intimidated when she discovered her ca windshield had been smashed. A note taped next to the hole in the windshield contained th words "STOP," on the cracked window was an upside down toy with a dead fish and a rec rose hidden underneath;

(c) On or about June 21, 2002, Plaintiff began receiving urgent telephone messages with a male voice on the other end, who asserted that there was a plan to blow up Plaintiff's car;

(d) In July 2002, two unknown males, apparently tracking Plaintiff's whereabouts, arrived at Plaintiff's parents' home, where Plaintiff had been staying, and threatened Plaintiff by their physical appearance;

(e) In August 2002, Plaintiff discovered that her computer had been hacked into and two months later her hard drive was destroyed by this tampering;

(f) On or about August 16, 2002, two males, driving a Mercedes with tinted windows and no license plate, drove at an excessive rate of speed in an attempt to run over

5

COMPLAINT

Plaintiff who barely escaped. The vehicle then pulled up right next to Plaintiff as the occupant then leaned out of the window and made menacing gestures in an apparent effor to assault and terrorize Plaintiff.

(g) In or about March 2003, Plaintiff's car was broken into and a sma was drilled near the driver's visor.

19. The above conduct frightened, terrified and devastated Plaintiff. Having telephones wiretapped, her computer hacked into and her life threatened, Plaintiff severely impacted in her ability to fully perform as a journalist.

20. Plaintiff also suffered monetary losses due to the damage to her property wit, her vehicle and computers.

### FIRST CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)
### (As Against Defendants Pellicano, Proctor, Arneson,
### Client Doe, Law Firm Doe and Does 1 through 100)

21. Plaintiff realleges and reaffirms each and every allegation contained Paragraphs 1 through 20 and incorporates the same as though fully set forth herein.

22. The course of conduct engaged in by Defendants, and each of them, including the direct threats on her life, the assaults, intimidation and purposeful invasion of privacy Illegal wiretapping constitutes extreme and outrageous conduct and are unacceptable in a decent and law abiding society.

23. The conduct of Defendants, and each of them, was intentionally designed cause immediate harm and injury to Plaintiff and instill fear and apprehension in Plaintiff

24. Defendants knew or should have known that the conduct alleged herein would result in Plaintiff's severe emotional distress, and said conduct was perpetrated Defendants with the intent to inflict, or with the reckless disregard of the probability inflicting mental anguish and severe emotional distress upon Plaintiff.

25. As a direct result of Defendants' conduct, Plaintiff became emotionall traumatized, fearful, anxious, mentally anguished, severely depressed, and suffered seven

6

COMPLAINT

The Smoking Gun: Archive

emotional distress, in a sum according to proof.

26.     Defendants, and each of them, acted in conscious disregard of Plaintiff's wel being to constitute malice, oppression, and/or fraud, pursuant to California Civil Cod Section 3294. Plaintiff is therefore entitled to punitive damages in an amount sufficient to punish or set an example of Defendants.

## SECOND CAUSE OF ACTION
### (Assault)
### (As Against Defendants Pellicano, Proctor, Arneson, Client Doe, Law Firm Doe and Does 1 through 31 and 65 through 100)

27.     Plaintiff realleges and reaffirms each and every allegation contained in Paragraphs 1 through 26 and incorporates the same as though fully set forth herein.

28.     Defendants, and each of them, conspired to cause and instill immediate fea and apprehension in Plaintiff.

29.     In doing the acts alleged above, Defendants, and each of them, as co conspirators, threatened to touch, harm and cause serious bodily injury to Plaintiff. Specifically, Plaintiff is informed and believes that Defendant Proctor at the request o Defendant Pellicano and Does 1 through 31, threatened Plaintiff with bodily harm when he left a dead fish and red rose on Plaintiff's smashed windshield. Plaintiff's further informed and believes that the unidentified males, Does 1 through 31 and/or 65-100 who attempted to instill fear of great bodily harm by following Plaintiff and making menacing gestures at her Plaintiff is informed and believes that all of the above conduct was carried out for the specific purpose of harming and/or instilling fear of immediate threat to Plaintiff

30.     Said conduct did in fact instill fear in Plaintiff that her life was in jeopardy, and as a direct result of Defendants' conduct, Plaintiff became emotionally traumatized, fearful anxious, mentally anguished, severely depressed, and suffered severe emotional distress, ir a sum according to proof.

31.     Defendants, and each of them, acted in conscious disregard of Plaintiff's well being to constitute malice, oppression, and/or fraud, pursuant to California Civil Code

7

COMPLAINT

---

Section 3294. Plaintiff is therefore entitled to punitive damages in an amount sufficient v punish or set an example of Defendants.

## THIRD CAUSE OF ACTION
### (Invasion of Privacy)
### (As Against Defendants Pellicano, Proctor, Arneson, SBC, Client Doe, Law Firm Doe and Does 32 through 53)

32.     Plaintiff realleges and reaffirms each and every allegation contained Paragraphs 1 through 20 and incorporates the same as though fully set forth herein.

33.     As a result of the conduct of Defendants, and each of them, Plaintiff's privacy rights guaranteed by common law and the California constitution were invaded in the Defendant Does 43 through 53, using their authority and position as SBC employees engaged in the wiretapping of Plaintiff's telephone lines, individually and as part of conspiracy with the other defendants. Does 32 through 42 also conspired and/or otherwise took action to violate Plaintiff's privacy rights.

34.     Plaintiff did not consent to such wiretapping and upon discovery, such invasion of privacy has caused damage and injury to Plaintiff, including emotional distress and fear all in an amount to be proved at the time of trial.

35.     SBC as the employer of Defendant Does 43 through 53 is responsible under the theory of respondeat superior for the acts of the employees, who using their autho knowledge, access and ability as employees of SBC, engaged in unlawful wiretapping Plaintiff's telephone lines.

36.     The individual defendants, and each of them, acted in conscious disregard of Plaintiff's well being to constitute malice, oppression, and/or fraud, pursuant to California Civil Code Section 3294. Plaintiff is therefore entitled to punitive damages in an amount sufficient to punish or set an example of the individually named Defendants.

///

///

///

8

COMPLAINT

Case 1:05-cv-01015-FB    Document 1    Filed 02/24/05    Page 25 of 60 PageID #: 27

## FOURTH CAUSE OF ACTION

(Violation of Statute - Penal Code §632 and 637.2)

(As Against Defendants Pellicano, Proctor, Arneson, SBC, Client Doe, Law Firm Doe and Does 1 through 100)

37. Plaintiff realleges and reaffirms each and every allegation contained in Paragraphs 1 through 20 and 33 through 36 and incorporates the same as though fully set forth herein.

38. Defendants, and each of them, intentionally and without consent of Plaintiff tapped or made an unauthorized connection with Plaintiff's telephone lines, wire, cable and thereby listened, recorded, eavesdropped and intruded on Plaintiff's internal telephone communications in violation of Penal Code §632 and 6372.

39. As a direct result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain general and special damages in a sum to be proved at trial.

40. Pursuant to Penal Code §637.2 (a), Plaintiff is entitled to three times her actual damages, which are in excess of $5,000.00.

## FIFTH CAUSE OF ACTION

(Violation of California Business & Professions Code Section 17200 et seq.)

(As Against Defendants Pellicano, Proctor, Arneson, SBC, Client Doe, Law Firm Doe and Does 1 through 100)

41. Plaintiff realleges and reaffirms each and every allegation contained in Paragraphs 1 through 40 and incorporates the same as though fully set forth herein.

42. This cause of action is brought on behalf of Plaintiff and members of the general public pursuant to California Business and Professions Code section17200 et seq which provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act set prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

9

COMPLAINT

---

43. The actions described herein constitute a violation of California Business and Professions Code section 17200, et seq. Specifically, Defendants have engaged in acts in violation of law, including, but not limited to violations of Penal Code sections 632 and 637.7 and the California Constitution.

44. Defendants have intentionally and in an effort to harm and injure Plaintiff assaulted, threatened and caused Plaintiff extreme emotional distress by engaging in unlawful business practices and abuses of the telephone system and police information. Defendants should be required to disgorge any and all profits derived from these wrongful acts.

45. As a result of Defendants' violation of the California Unfair Practices Act, Plaintiff is entitled to restitution damages, out of pocket expenses, and economic harm suffered.

## SIXTH CAUSE OF ACTION

(Negligence)

(As Against Defendants SBC and Does 43 through 53 and 65 through 100)

46. Plaintiff realleges and reaffirms each and every allegation contained in Paragraphs 1 through 20 and incorporates the same as though fully set forth herein.

47. Defendants owed Plaintiff a duty of care to engage in lawful business activities and to ensure that its employees did not harm, injure or cause damage to customers such as Plaintiff.

48. Defendants breached said duty of care in that Defendants, and each of them negligently hired, trained, instructed and supervised and disciplined their employees whereby SBC employees unlawfully gained access to Plaintiff's private communications illicit and improper means, for the purpose of harming Plaintiff

49. As a result of the negligence of the Defendants, and each of them, Plaintiff injured in her health, strength and activities, sustaining injuries and damages in an amount according to proof.

///

///

10

COMPLAINT

---

## SEVENTH CAUSE OF ACTION

### (Negligence)

(As Against Defendants CITY OF LOS ANGELES and Does 65 through 100)

50. Plaintiff realleges and reaffirms each and every allegation contained in Paragraphs 1 through 20 and incorporates the same as though fully set forth herein.

51. Defendants owed Plaintiff a duty of care to maintain police information private and secure and to refrain from disclosing information obtainable only by police department officials to members of the public.

52. Defendants breached said duty of care in that Defendants, and each of them, negligently hired, trained, instructed and supervised and disciplined their employees whereby CITY OF LOS ANGELES employees, including Defendant Arneson used private police information about Plaintiff, available only to police officials, and disclosed said information to non-police personnel, including Defendants Pellicano and Proctor.

53. As a result of the negligence of the Defendants, and each of them, Plaintiff was injured in her health, strength and activities, sustaining injuries and damages in an amount according to proof.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

11

COMPLAINT

---

## PRAYER

WHEREFORE, Plaintiff requests judgment as follows:

1. General damages, according to proof;

2. Special damages, according to proof;

3. Attorney fees, according to applicable statutes;

4. Treble damages, according to applicable statutes;

5. Punitive damages as to the First, Second, Third, Fourth and Fifth Causes of Action;

6. Costs of suit incurred herein; and

7. Such other and further damages and costs the Court deems appropriate and necessary.

Dated: May 28, 2004                     GERAGOS & GERAGOS

                                By: _____
                                    MATTHEW J. GERAGOS
                                    Attorneys for Plaintiff
                                    ANITA BUSCH

12

COMPLAINT

# EXHIBIT B

UNITED STATES DISTRICT COURT

----------------------------------X       Docket#
UNITED STATES OF AMERICA :               02-cr-606

- versus -                        :       U.S. Courthouse
                                          Brooklyn, New York
VINCENT NASSO and                 :
JULIUS NASSO,                             February 17, 2004
                Defendants        :
----------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:          Roslynn R. Mauskopf, Esq.
                             United States Attorney

                        BY: Andrew Genser, Esq.
                             Assistant U.S. Attorney
                             225 Cadman Plaza East
                             Brooklyn, New York 11201


For Defendant V. Nasso:      Barry Levin, Esq.

For Defendant J. Nasso:      Robert J. Hantman, Esq.
                             Richard Signorelli, Esq.


Official Transcriber:        Rosalie Lombardi
                             L.P.

Transcription Service:       Transcription Plus II
                             823 Whittier Avenue
                             New Hyde Park, N.Y. 11040
                             (516) 358-7352

Proceedings recorded by electronic sound-recording, transcript produced by
transcription service

---

Proceedings                                                    2

2   report this afternoon for sentencing, United
3   States of America v. Vincent Nasso and Julius Nasso.
4          I ask all of the parties to step forward and state your
5   appearances for the record.
6          MR. HANTMAN: Robert Hantman,
7   Hantman & Associates for Julius Nasso,
8   your Honor.
9          MR. GENSER: Andrew Genser for the United States.
10         Good afternoon, your Honor.
11         MR. LEVIN: Barry Levin,
12  666 Old Country Road, Garden City for
13  Vincent Nasso.
14         Good afternoon, your Honor.
15         THE COURT: All right.
16         MR. SIGNORELLI: Good afternoon,
17  your Honor.
18         Richard Signorelli also for
19  Julius Nasso.
20         THE COURT: Very good.
21         Now, I think what we want to do today is to try to
22  collectively get our hands around the massive material that has been
23  furnished to me on behalf of the two Nasso brothers. Let me suggest
24  some sort of structured way of proceeding, so we don't just all go in
25  14 different directions and start interacting about things which may or
    may not be relevant; okay?

Transcription Plus II      Rosalie Lombardi

---

Proceedings                                                    3

1          It initially surprises me that since both Nassos have
2   agreed to an 11(e)(1)(C) plea disposition for a term certain of
3   incarceration that all of this massive amount of material was furnished
4   to the Court.
5          But I do understand on some level why astute counsel has
6   made that humongous effort and obviously spent a considerable amount
7   of time in putting forward those excellent papers
8   because we do have a presentence report which runs for, I think, 65
9   pages of single space and addresses all of the 17 defendants initially
10  brought into this indictment and it makes a lot of references to the
11  Nassos which may or may not be accurate.
12         And I guess defense counsel appropriately says wait a
13  second. I just don't think that we should allow the PSR to go
14  unattended to. Who knows where it's going to wind up? Who knows to
15  what extent the BOP may rely upon some information contained in that
16  report for whatever purpose and they wish to have it sanitized to
17  reflect what they believe to be the true facts rather than those facts
18  that are set forth in the presentence report.
19         MR. GENSER: Your Honor, may I make a suggestion?
20         THE COURT: Having said that -- let me just continue
21  because I think I can frame all of this and I'm going to ask for your
22  suggestions.
23         So, we have here applications for adjournments.
24         MR. LEVIN: Not on behalf of Vincent Nasso.
25         THE COURT: Pardon?

Transcription Plus II      Rosalie Lombardi

---

Proceedings                                                    4

1          MR. LEVIN: Not on behalf of Vincent Nasso. We're
2   prepared to go forward.
3          THE COURT: On behalf of Julius Nasso. I think the
4   request was for a four month adjournment to address all of the factual
5   disagreements on behalf of Julius Nasso.
6          MR. GENSER: Your Honor, there's been a letter
7   submitted withdrawing the disputes.
8          THE COURT: All right. So, then if there's something
9   new that's happened fill me in.
10         MR. HANTMAN: Your Honor, February 13, 2004 with
11  your Chamber's permission, we faxed you over a letter which indicated
12  that while we had disagreements with some of the statements in the
13  PSI, we didn't believe they were relevant and material for purposes of
14  sentencing. And we reserve, naturally, the right to argue some of the
15  other downward departures, not to change the agreement but in order to
16  convince you, Judge, to accept the pending agreement. If you will,
17  your Honor, I have a copy of that letter.
18         THE COURT: No, I have that. I think I have that. It was
19  just handed to me by
20  Mr. Inelti, the Court's excellent clerk, just five minutes ago. It's the
21  same letter we're referring to, I guess; right?
22         MR. HANTMAN: Exactly.
23         THE COURT: Okay. I understand that.
24         Let's sort of go back to what 11(e)(1)(C) is all about and
25  there are very few reported cases informing the Court as to how to

EXHIBIT B

## Proceedings

5

1  process an 11(e)(1)(C) scenario, I think for obvious reasons because
2  both parties are happy with the deal they struck and whose motivated
3  to appeal to the Circuit Court of Appeals.
4     But the issue does arise under certain circumstances.
5  Now, for example, there is somewhat of a useful decision coming out
6  of the D.C. Circuit in United States v. Goodall, G-o-o-d-a-l-l, 2001 at
7  236 F.3rd 700.
8     The reason why I am referring to this because I think it
9  helps us frame what we ought to be doing in order to appropriately
10  discharge our responsibilities and in particular, the Court's
11  responsibilities under 11(e)(1)(C) in deciding whether to accept the
12  plea or not.
13     The conceptual problem that the Court has in that respect
14  is that much of the material that has been submitted on behalf of both
15  Nassos takes issue with the way in which the offense level should be
16  calculated with the various guideline provisions. For example, there is
17  a question as to whether the law should be $6 million instead of
18  $700,000 and other things separate and apart from factual statements
19  in the PSR which I will deal with also.
20     So, one reading of 11(e)(1)(C) would require arguably the
21  Court to make the guideline calculation and then to determine whether
22  the agreed upon plea is within the range of our calculation or if not
23  within the range of the calculation be it less or more, to then consider
24  whether there is proper circumstances or justifications to exercise its
25  discretion, to accept the agreed plea notwithstanding the fact it may

---

## Proceedings

6

1  not square with the sentencing guidelines.
2     If the Court were to go in that direction, it would then be
3  obliged to calculate under the sentencing guidelines what the total
4  offense level would be and what the range would be under the
5  guideline.
6     It seems to me based upon the voluminous submissions
7  that I've received and the enormous amount of controversy raised by
8  defense counsel with what's in the PSR, that that would be an
9  enormous undertaking full of all sorts of questions that may or may not
10  have to be flushed out at a hearing which would require an enormous
11  amount of judicial resources to weigh through all of the material and
12  it's not free from doubt whether a particular adjustment should or
13  should not be made in attempting to arrive at a guideline range.
14     The Court would like to avoid that for obvious reasons. If
15  the Court is constrained under law in the discharge of its
16  responsibilities to calculate the guideline range, we're going to
17  arguably have an enormous proceeding or proceedings that we'll have
18  to undertake and it may not be free from doubt. I may have to make
19  some reasoned judgments, make some findings of fact and things of
20  that nature.
21     So, is it necessary in the discharge of the Court's judicial
22  responsibilities to go that route? In other words, is there a way to say
23  that I don't have to make that calculation and I can decide whether
24  these plea agreements square with concepts of justice and fairness and
25  smacks of an appropriate disposition under all of the circumstances of

---

## Proceedings

7

1  this complex prosecution involving 17 defendants and global plea
2  agreements, on and on and on. And that's what I want to toss out to
3  distinguished counsel in the first instance.
4     In that respect, there's been some changes a few years ago
5  to Rule 11(e)(1)(C) and I will then make reference to them and then
6  talk once again about what the majority in the Goodall decision said.
7     Before 1999, 11(e)(1)(C), if I recall correctly, used to
8  require some justification to be put forth by the particular effonted
9  party for accepting the plea agreement based upon whether it was more
10  or less than the guideline range. That was changed in 1999 and since
11  then, 11(e)(1)(C) reads as follows.
12     "The attorney for the government and the attorney for the
13  defendant may agree that upon the defendant's entering a plea of guilty
14  or nolo contendere, to a charged offense or to a lesser or related
15  offense, the attorney for the government will," and now we talk about
16  (C), "agree that a specific sentence or sentencing range is the
17  appropriate disposition of the case." Now you've done that. "Or that a
18  particular provision of the sentencing guidelines or policy statement or
19  sentencing factor is or is not applicable to the case." That's something
20  that's new.
21     So, it seems to me that the statute now has amended is
22  reinforcing what the perception was, perhaps, of the judiciary prior to
23  the amendment that there's enormous discretion on the part of the
24  Court to accept or reject the proposed plea agreement.
25     And then, of course, if the Court doesn't accept it,

---

## Proceedings

8

1  naturally the parties have the opportunity to withdraw the plea.
2     Noticeably absent from the revisions to 11(e)(1)(C) is the
3  need for "justification." However, the concept of justification still
4  exists in the guidelines manual and specifically in 6(b)(1.1) and it
5  provides that Rule 11 "that in the case of a plea agreement that
6  includes a specific Rule 11(e)(1)(C), a specific sentence under Rule
7  11(e)(1)(C), the Court may accept the agreement if the Court is
8  satisfied either that (1), the agreed sentence is within the applicable
9  guideline range that would require the Court to fix the guideline
10  range," which I would like to avoid doing, "or (2), the agreed sentence
11  departs from the applicable guideline range for justifiable reasons."
12  Once again, it would require the Court to fix the guideline range and
13  then determine whether there are justifiable reasons to depart.
14     Now, for example, if a guideline range carried a ten year
15  sentence and the agreed deal was six months, the Court presumptively
16  in that situation would be inclined to not approve of the plea unless
17  there was some powerful justification for such an enormous departure.
18     Now, you have the guideline manual saying one thing.
19  You have 11(e)(1)(C) as amended in 1999 not tracking that language.
20  What does it all mean?
21     Getting back to Goodall, the Circuit, two to one,
22  interpreted the guideline manual as being a guide, as being advisory.
23  Specifically 6(b)(1.2) was promulgated, so says the majority of the
24  Court in Goodall to guide, not to constrain courts in deciding whether
25  to accept or reject the plea agreement.

## Proceedings 9

And the Court holds specifically that a district court
remains free to consider the applicable sentencing guidelines range
both in deciding on whether to accept an agreed upon sentence and in
deciding on an appropriate sentence within an accepted range. It is
simply not compelled to do so.

The concurring decision by
Judge Randolph of the D.C. Circuit takes a stricter view of the
guidelines manual and would adhere to the concept of justifiable
reasons being proffered.

But I think that the majority decision in Goodall tracks
my sense of what 11(e)(1)(C) is designed to accomplished. Namely, in
an appropriate given case, not to necessarily be required to have to
calculate the guideline range especially since 11(e)(1)(C) also allows
the parties to agree that a particular provision of the sentencing
guidelines or policy statement or sentencing factor is or is not
applicable to the case.

Now, you haven't gone into that specifically but it does
show that the parties could agree that we're not going to be concerned
about the factual dispute in terms of loss calculation, for example or
whether this was a situation where the threat was one of bodily harm or
death. All of these would require the Court to possibly have enormous
factual hearings which I think would be counter productive to the fact
that distinguished counsel have spent an enormous amount of time in
the context of an enormously complex scenario involving 17
defendants with global plea dispositions and all the internecine aspects

## Proceedings 10

that go into the exercise of prosecutorial discretion to propose to the
Court that this particular plea deal be accepted.

The Court is inclined to respect the exercise of
prosecutorial discretion in this case because, I think, the government
has acted obviously forcefully in the prosecution of this case, has not
shown any weakness in presenting the case to the Court and has
obviously a greater command of practical factors that entered into the
exercise of its discretion than the Court has because the Court is
proscribed by Rule 11 from engaging in plea negotiations. If not for
that proscription, the Court would then be perhaps in a better position
than it otherwise would be to determine whether the government's
prosecutorial discretion has been appropriately exercised.

But I sense it has been and I think it would be
inappropriate under the facts of this case and the circumstances of this
case for the Court to feel bound by some strictures that otherwise
arguably could be put forth in terms of having to justify departure so-
to-speak from the calculated guideline manual.

I think that it would be inappropriate, unwise and I
suspect not necessary considering the discretion which the Court has.

Now, I want to add one other factor. The Court is not
unmindful of the factors and circumstances involved in the Nassos'
criminal activities because I sat for weeks hearing their names being
bandied about day in and day out. I think the Court is in a very good
position to decide based upon what I've heard throughout this trial plus
looking at all of these submissions, whether it's comfortable with that

## Proceedings 11

proposed plea agreement. And it decidedly is comfortable.

I read the allocution before the magistrate judge who was
kind enough to take the pleas. We'll talk about that. I've gone over
the plea agreement and I'm perfectly satisfied to accommodate the
agreement which the parties have entered into.

First, I point to the government,
Mr. Genser. In light of 11(e)(1)(C), in light of the guidelines manual
that I just referred to, is there any reason that you can see that would
require the Court in the proper discharge of its judicial functions to
actually have to make a guidelines range calculation?

MR. GENSER: Your Honor, I have been listening
carefully to your discussion of the law.

THE COURT: As you always do.

MR. GENSER: And I really appreciate the thought that
your Honor put into it. And I agree with your Honor that it's not going
to be necessary in this case to make specific findings about each of the
guidelines. But I also want to point out to your Honor that with
respect to Julius Nasso, he has withdrawn any of his disputes and we're
prepared to go forward with that. It's a very simple matter.

The guideline calculation for Julius Nasso, although we
submit --

THE COURT: Can you agree upon it?

MR. GENSER: Your Honor, I don't think there's a dispute
because the basis for the agreement that the government has with
counsel is based on a downward departure from what the guidelines

## Proceedings 12

are. The dispute that's been raised about loss amount only effects one
level of the --

THE COURT: So, what you're saying is that the parties
can agree upon the guidelines calculation essentially.

MR. GENSER: It's my understanding that there really is
not a dispute on that in light of the most recent submission from
Mr. Hantman. I would appreciate it if
Mr. Hantman could step in and confirm that.

THE COURT: Well, let's just put that aside.

MR. GENSER: All right.

THE COURT: How about with Vincent Nasso?

MR. GENSER: With Vincent Nasso,
your Honor, and I want to assure the Court that whether your Honor
engages in a guideline calculation or not, the guideline calculation
absolutely justifies the plea in the case and the agreement in the case.
And pursuant to Rule 11(e)(1)(C) as your Honor pointed out, the
parties can agree about particular guideline factors and there is a
provision in the plea agreement that Mr. Levin and
Mr. Nasso, Mr. Vincent Nasso, agreed to about how the guidelines
should be calculated.

On the second page of the agreement, it states explicitly,
"The defendant agrees not to dispute the office's assertion that the loss
from the offense for sentencing guidelines purposes is greater than
$2.5 million." Now --

THE COURT: Well, there's some sort of question about

## Page 13

1  that now that it's raised in a recent submission.

2       MR. GENSER: And, your Honor, the government's

3  application with respect to that is that your Honor should enforce the

4  agreement between the parties. There's a --

5       THE COURT: Then what you're telling is that you believe

6  that the Court should make the guideline calculation.

7       MR. GENSER: I'm saying if your Honor finds it

8  necessary. I don't -- I think that there is no factual dispute and the

9  guidelines wind up exactly at the range that Vincent Nasso is.

10      THE COURT: This is what I am trying to avoid because

11  Mr. Levin says there is a dispute. Let's turn specifically to this.

12      MR. GENSER: Your Honor, may I make one suggestion in

13  terms of how we approach this procedurally?

14      THE COURT: Yes.

15      MR. GENSER: I think in light of the absence of any

16  suggestion of a dispute with respect to defendant Jules (sic) Nasso,

17  that we should focus on that and get through that. I think we could do

18  that quickly and then we can focus on Vincent Nasso and see whether

19  there really is any type of a dispute.

20      THE COURT: Well, we can take a look but I guess what I

21  wanted to hear from you in light of my explication of the law, as to

22  whether you concur with the Court that it may not be necessary to even

23  engage in guidelines calculation determinations.

24      MR. GENSER: I agree with that,

25  your Honor. And all I was doing was --

## Page 14

1      THE COURT: If that's the case, then we can cut through

2  everything here. We can cut through everything.

3      MR. LEVIN: Your Honor, may I be heard on that issue?

4      THE COURT: Yes and then separately we'll talk about to

5  what extent counsel thinks that the PSR ought to be sanitized and what

6  the government recommends in that respect and what the Court can do.

7      Mr. Levin, you represent --

8      MR. LEVIN: Vincent Nasso.

9      THE COURT: Well, we'll talking about Julius Nasso now.

10      MR. LEVIN: All right. Then I will step back until your

11  Honor is ready for me.

12      THE COURT: Who is the one who is taking issue with the

13  plea agreement; was it Vincent?

14      MR. LEVIN: Your Honor?

15      THE COURT: Yes, it was Vincent.

16      MR. LEVIN: Yes.

17      THE COURT: You were taking issue.

18      MR. LEVIN: Yes, okay, that would be me.

19      THE COURT: You wrote to me saying you want that plea

20  agreement to be changed. You think that the $250,000 should be set

21  forth to be restitution and not the fine, that you also want it changed to

22  $2.5 million loss calculation.

23      MR. LEVIN: Correct.

24      THE COURT: So, you wanted to change the agreement.

25      MR. LEVIN: Your Honor, as an officer of the Court --

## Proceedings 15

1      THE COURT: If you agree with counsel, fine.

2      MR. LEVIN: There are three points here, your Honor.

3  The first of which is in 11(e)(1)(C), your Honor has the discretion to

4  go below 24 months in this particular agreement. The agreement does

5  not preclude that and even contemplates it in --

6      THE COURT: Do you want to change the plea agreement;

7  yes or no?

8      MR. LEVIN: Well, your Honor, here's my problem and I'll

9  be very frank with the Court. The $2.5 million loss amount was

10  supposed to be a fiction that Mr. Genser was inserting into our plea

11  agreement. At the time this was being negotiated, I did not have the

12  subpoenaed documents that I now have which I can present to the

13  Court.

14      THE COURT: So you are not happy --

15      MR. LEVIN: It's a very simple argument, your Honor.

16  Those documents will evidence that all of the testimony your Honor

17  heard as to the MYLA (phonetic) account was false. That there was no

18  savings, there was no --

19      THE COURT: Mr. Levin, let me interrupt you. By the

20  way, I really intend to interrupt when I say let me interrupt.

21      MR. LEVIN: So, I stopped.

22      THE COURT: I'm not saying I don't mean to interrupt but

23  because that's kind of silly, right?

24      You want to change the plea agreement. You may have

25  reasons to want to change it but you're telling me in your letter of

## Proceedings 16

1  January 6 the following. That you want to delete in paragraph 2 the

2  term, "a fine of and instead provide for restitution." And then you say

3  in paragraph 2 also that you want to delete the sentence that says, "The

4  defendant agrees not to dispute the office's assertion that the loss for

5  the offense for sentencing guidelines purposes is greater than $2.5

6  million."

7      And so, you then say, "Please amend the party's plea

8  agreement with the above mentioned changes forthwith. We also

9  should arrange for Mr. Nasso's reallocution and have the plea

10  agreement entered before the February 9 sentencing." I'm not so sure

11  that's necessary.

12      But basically, if you and the government want to agree to

13  abandon any of the sentencing guidelines requirements or provisions,

14  if you want to agree to amend your agreement, you can do so. But if

15  you don't agree to do so, then I have a problem, don't I?

16      MR. LEVIN: Well, initially if I may be heard, your

17  Honor, the government had agreed to some respects to those requests.

18  Those --

19      THE COURT: I'll ask Mr. Genser. Do you agree --

20      MR. LEVIN: Let me just finish my thought.

21      THE COURT: All right.

22      MR. LEVIN: Those request go back to August 12, the

23  night before my client pled.

24  Mr. Genser had previously agreed to convert the fine to restitution in

25  light of

17

Mr. Nasso's voluntary payments. The issue of the $2.5 million has
been an ongoing discussion. Mr. Genser has not agreed to it but there's
been an ongoing discussion from six months ago.

THE COURT: Okay. So, now let's stop. All right? If
you folks want to still talk to each other, you can go up to my chambers
and sit down. Pour yourself a cup of tea, you know? And continue
your negotiations.

It seems to me that it's in everyone's best interest to see
whether we can have an agreement. Now if, for example, you can't
agree that we should not concern ourselves with sentencing guidelines
issues, then we have to -- I have to think about whether or not I should
make a sentencing calculation here.

Now I'll have to consider whether or not the loss is
greater than $2.5 million or less. I may have to have a hearing to do
that. I may have to take testimony. Who knows where that unchartered
scenario will wind up. I don't think it's in everybody's best interest to
do that.

Now, do you want to talk to each other further about this
now that you've heard the Court's concerns?

MR. LEVIN: I'm always willing to talk, your Honor.

THE COURT: Mr. Genser, what's your position?

MR. GENSER: Your Honor, the government's position is
that the agreement was entered into in good faith by the government
with Mr. Levin.

THE COURT: You want to enforce the agreement. You

18

don't want to amend it.

MR. GENSER: That's correct,
your Honor. And to the extent that Mr. Levin, as I understand it, is not
asking for a sentence different from what's agreed to in this, I don't see
why any of these disputes are material.

THE COURT: Here is the problem. If I make the
sentencing guideline calculation, it's going to come out to what, 30
months or something like that?

MR. LEVIN: I'm sorry, Judge, I didn't hear what you said.

THE COURT: It will come out to something like 30
months.

MR. GENSER: It will come out to 27 months.

THE COURT: Okay.

MR. GENSER: A range of 27 to something months. Then
there's an additional global point which gets it exactly into the range
where this sentence is, which is 24 months.

To the extent -- let me just put this on the record and this
may short circuit it.

THE COURT: No, just one second. So, that brings it
within the range.

MR. GENSER: Absolutely.

THE COURT: Okay. So, that would not be a problem.

MR. GENSER: And he has agreed specifically in the
agreement, all of the information that he is claiming he didn't have at

Proceedings                    19

the time is -- it's not a valid position to take. He has, as an officer of
the Court, entered into an agreement with the government.

THE COURT: Okay. Stop.

MR. GENSER: And --

THE COURT: Mr. Levin, there is some wisdom to what
Mr. Genser says. If I hold your client to the agreement which was
entered into, he would come out roughly within the range that was
agreed upon for sentencing purposes.

MR. LEVIN: Only if your Honor is of the opinion at the
end of the day that there was a loss here. I submit there wasn't a loss.

THE COURT: Just one second. So, you would propose
what?

MR. LEVIN: Your Honor, what I am proposing is --

THE COURT: That I should not accept the plea
agreement? I'll go to trial. Are you ready to start to try the case?

MR. LEVIN: Well, I would ask to have time to speak with
my client, Judge.

THE COURT: Just one second. You're telling me that
you don't want me to accept the plea agreement?

MR. LEVIN: Your Honor, I am asking for time to speak
to my client.

THE COURT: For what purpose?

MR. LEVIN: To discuss that issue. If your Honor is -- if
you're giving me an all or nothing approach, I have to sit down with my
client. His family is here. It's a very important decision.

Proceedings                    20

THE COURT: Well, Mr. Levin, let's just get a little bit
more focused. You have a plea agreement. Are you telling me that you
want to make an application for good cause not to be bound by that
plea agreement? That's all I want to know. People make plea
agreements. Then they want to withdraw their plea. They can make an
application to the Court for good cause to withdraw the plea. I can
consider it.

If you want to do that --

MR. LEVIN: I understand my rights, your Honor.

THE COURT: -- you have rights to make an application.

MR. LEVIN: Your Honor, if you're asking me optimally
what I want, I believe that after our presentation, the Court will come
up with a guideline range of probably at most zero to eight months,
possibly 13 to 18 months depending on one disputed fact.

THE COURT: Let's assume I were to do that. I may have
to have a hearing. I don't know. You realize that. Let's assume I do
that. Then what's your position?

MR. LEVIN: My position is --

THE COURT: That I should not sentence your client to
the agreed sentence of 24 months? I just want to get clarification.

MR. LEVIN: I would be asking the Court to sentence my
client to a lesser sentence based upon the fact that the $2.5 million was
not accurate. I --

THE COURT: Then you want to abrogate the plea
agreement.

**Proceedings** 21

1      MR. GENSER: Your Honor?

2      THE COURT: I can take care of it myself. You want to

3  abrogate the plea agreement on, I think if I follow your logic, that

4  events have surfaced, information has come to your attention

5  subsequent to entering into the plea agreement which you think sort of

6  compromises the integrity of the plea agreement and, therefore, you

7  wish the Court to allow you to withdraw the plea agreement.

8      I can't let you have it your way. I am not going to

9  sentence your client to eight months or ten months. I will consider

10  whether to allow you to withdraw the plea agreement if you want to

11  make an application for me to do that.

12      Is that your wish?

13      MR. LEVIN: Your Honor, I would ask for ten minutes

14  with my client while you go forward with ---

15      THE COURT: You had better talk to your client right now

16  and you're going to tell me quite frankly ---

17      MR. LEVIN: I'm sorry, Judge?

18      THE COURT: -- whether you're going to tell me quite

19  frankly whether you wish me to consider allowing you to withdraw

20  your plea agreement which will require your client to be sentenced to

21  24 months and also to provide for the fine I think that's set forth in the

22  plea agreement. If you want to do that, you can make a motion.

23      MR. LEVIN: I understand that, Judge.

24      THE COURT: And I'll consider it.

25      MR. GENSER: And, your Honor, just for the record, I

**Proceedings** 22

1  just want to be clear. The government disputes any assertion that there

2  is new information that could justify withdrawing the plea.

3      THE COURT: All I am suggesting is that --

4      MR. GENSER: But I appreciate what your Honor has said.

5      THE COURT: -- I would not preclude a defendant from

6  making an application --

7      MR. GENSER: Of course, he can make the application.

8      THE COURT: -- to withdraw a previously entered guilty

9  plea. I'm not saying that I would go along with it but I think if wisdom

10  indicates that he wants to do so, I can't stop him from doing that.

11      MR. GENSER: That's correct. But there must be good

12  cause as your Honor indicated.

13      THE COURT: Then the government will have the

14  opportunity to respond. I'll decide whether there's good cause. I'll

15  decide whether he should be bound by the agreement.

16      MR. GENSER: Your Honor, while he is considering that,

17  if I may just put forward one further point which is that to the extent

18  that the guidelines, to the extent that there is some merit, which there

19  is not, to

20  Mr. Levin's contention about the guidelines there's ample grounds on

21  the record for an upward departure from the 24 months. But to the extent

22  your Honor needs to come up with --

23      THE COURT: Well, I think that you're getting ahead of

24  yourself.

25      MR. GENSER: Yes.

**Proceedings** 23

1      THE COURT: I think you're getting ahead of yourself. I

2  am encouraging you folks to agree --

3      MR. GENSER: Yes.

4      THE COURT: -- in the context of the amendment to Rule

5  11(e)(1)(C) on whether the guideline ranges are applicable, not

6  applicable, whether I need to go through that exercise.

7      MR. GENSER: I thought we had done that but I --

8      THE COURT: I don't think I have to but it will nice if we

9  can all agree on what the range would be, if it falls within the plea

10  agreement and makes it a slam dunk for the Court in terms of its

11  comfort level in accepting the agreed upon plea.

12      MR. LEVIN, if you want to walk away from your plea

13  agreement, you're going to have to make an application to do so.

14      MR. LEVIN: I understand.

15      THE COURT: You can't have it both ways. Talk to your

16  client now and get closure. Vincent Nasso, front and center.

17      MR. GENSER: Vincent or Jules,

18  your Honor? Did you want Vincent or Jules?

19      MR. LEVIN: This is Vincent, Judge.

20      THE COURT: This is Vincent? Jules now. So, Vincent

21  has to do some talking.

22      MR. LEVIN: May we step to the back, your Honor, while

23  they go forward?

24      THE COURT: You can go outside. You can discuss this

25  with your client. I'm sorry.

**Proceedings** 24

1      Now, you're going to speak on behalf of your client, Jules Nasso,

2  Mr. Hantman?

3      MR. HANTMAN: Your Honor, I just want to emphasize

4  that, in fact, we did submit a 51 page response to the government's

5  presentence investigation report and subsequently, we agreed that

6  while we do not agree with much that's in the report, we believe that

7  for purposes of sentencing, those issues were neither material nor

8  relevant.

9      We certainly would like an opportunity to sanitize the PSI

10  report and we think we have substantial basis that it should be

11  modified. But at the same time, your Honor, in Mr. Julius Nasso's

12  situation, it's a little bit different because we already have an agreed

13  upon departure which really is not in dispute, number one.

14      And number two, in our particular case, even the

15  probation department recognized that there were other available

16  departures including the extraordinary employment, family

17  circumstances, substantial extraordinary rehabilitation and totality of

18  the circumstances, which they would defer to your Honor.

19      Now again, I was prepared to argue some of this not for

20  the purpose of avoiding the plea agreement but for the purpose of

21  convincing this court that the plea agreement should be approved. And

22  I do understand, we appreciate the research your Honor has done and

23  we believe that if we are to proceed, we would like to be heard on some

24  of the other different departures and then leave it to

25  your Honor's discretion. We're really not in conflict with Mr. Genser.

1  THE COURT: So, you're telling me that in respect to your

2  client, Julius Nasso, we can, you know, engage in guidelines

3  calculation determinations and see how all of that shakes out.

4    MR. HANTMAN: No, actually --

5    THE COURT: Because you don't disagree on how they

6  should be calculated.

7    MR. HANTMAN: No, actually,

8  your Honor, we do disagree in the calculation. We definitely disagree

9  in the calculations. However, in --

10    THE COURT: What do you disagree --

11    MR. HANTMAN: -- Ms. Julius Nasso's situation, we don't

12  believe that they're relevant for purposes of accepting the agreed upon

13  departure.

14    THE COURT: Now look, let me ask you this question.

15  Either I make the guidelines calculations or I do not make the

16  guidelines calculations. If you all agree on what the offense level

17  computation should be, then it makes that concern of mine academic.

18  If you don't agree, then I'll have to decide whether I should just ignore

19  the guidelines calculation scenario or engage in guidelines calculation

20  determinations as I deem appropriate under the circumstances.

21  Which do you prefer that I do?

22    MR. HANTMAN: Well, your Honor, I believe and maybe

23  Mr. Genser could --

24    MR. GENSER: Your Honor, may I have a moment to

25  speak with Mr. Hantman?

## Page 26 (right top)

1    THE COURT: You want to speak to each other now?

2    MR. GENSER: Yes.

3    THE COURT: Sure.

4    MR. GENSER: If we could have a moment.

5    (Pause in proceedings)

6    (Discussion held off the record)

7    THE COURT: Go ahead, Mr. Genser.

8    MR. GENSER: Your Honor, what I think we would jointly

9  propose is that there are apparently different views as to how the

10  guideline should be calculated.

11    THE COURT: Yes.

12    MR. GENSER: However, the parties agree that regardless

13  of what particular level comes out, the difference is not so great as to

14  effect what the ultimate sentence should be. And so what we propose

15  is, if the Court would like we could make a record of what our

16  respective positions are in the guidelines and then make a record of the

17  departure that we think justifies the plea in this case.

18    And, therefore, it will not be required for your Honor to

19  resolve any difference in the guideline calculation if your Honor

20  agrees that regardless of where the calculation falls out, the departure

21  would justify sentence to what has been agreed upon between the

22  parties. And I think that that's

23  the most expedient --

24    THE COURT: Well you can state your respective

25  positions but what you're saying basically is that the government's

## Page 27 (left bottom)

Proceedings  27

1  going to adhere to a base offense level of 24 for guidelines calculation

2  purposes which would require a range of Imprisonment of 51 to 63

3  months. That's a lot of jail time compared to the year and a day that's

4  the basis of the plea agreement.

5    I have some problems with that because of the great

6  disparity. On the other hand, if we're not going to have a seven level

7  enhancement because arguably there was $63 million involved, which I

8  think is problematic, then, you know, we have a different range and the

9  Court may feel more comfortable with accepting the agreed upon plea.

10    MR. LEVIN: Your Honor?

11    THE COURT: I don't see where $63 million is so clearly

12  established here for the purposes of paragraph 244.

13    MR. GENSER: Your Honor, that would account for a one

14  level reduction to the next level.

15    THE COURT: What would the next level --

16    MR. GENSER: For purposes of this proceeding the

17  government does not think it's necessary to have a hearing on that.

18  And we would argue that the departure grounds would suffice.

19    THE COURT: Educate me. The next level would be 6

20  instead of 7 when we're talking about paragraph 244?

21    MR. GENSER: Yes, your Honor.

22    THE COURT: If 6 kicks in respect to what range?

23    MR. HANTMAN: Excuse me, your Honor, in anticipation

24  that we know that your Honor would look at the underlying facts, that's

25  why in spite of the agreement in place, we submitted so much

Proceedings  28

1  information to your Honor. Frankly we believe and this is not trying to

2  reject the plea agreement, but we believe that some of the issues we

3  raised with the PSI, particular the 2(b)(3.3) should apply rather than

4  2(b)(3.2) and some other things, would have brought it down to within

5  a range that your Honor certainly would have agreed to the plea

6  agreement.

7    THE COURT: So, you want me to make the guideline

8  calculation.

9    MR. HANTMAN: No, we don't think it's necessary.

10    MR. GENSER: Your Honor, we don't think it's necessary.

11  We think that

12  your Honor can -- that we can make a record of the --

13    THE COURT: Let's focus on --

14    MR. GENSER: -- departure basis. I think your Honor has

15  a sense of what the high end of the range would be from

16  the government's point of view. There may be some disputes about how

17  that plays out but I don't know that we need to go through the exercise

18  of resolving each one.

19    THE COURT: But if I agree with the government, then I

20  think that 51 months is the minimum guideline calculation, how do I

21  support reducing this to a year and a day?

22    MR. GENSER: The reason for that,

23  your Honor, is there's a substantial record that's been presented to the

24  Court in the form of documentation of severe and acute anxiety and

25  other disorders that Mr. Julius Nasso was experiencing at the exact

1   same time of the offense.

2         And that justifies, in the government's view, a departure

3   under the diminishment of capacity grounds. He was basically

4   experiencing nervous breakdowns. He was under the care of numerous

5   physicians. He was on medication during that time. And that jives

6   with the trial testimony we had in court.

7         The government has agreed that the year and a day

8   sentence and the fine is sufficient punishment in light of the acute

9   nature of that psychological trauma that

10  Mr. Nasso was experiencing. It was supported in the evidence that we

11  presented at trial. There was reference to it among the

12  co-defendants and the wiretaps. It's been supported by a report from

13  Dr. Drobb (phonetic). And we think that that's a reasonable departure

14  to support the agreement.

15        THE COURT: Well, you know, the only problem I have

16  there is that Julius Nasso was an accomplished business person. He

17  has produced four films subsequent to the break up of Steven Seagall.

18  He's a man who has made millions of dollars in the film industry. That

19  seems counter intuitive that this man had diminished capacity. What

20  kind of movies are being made by people with diminished capacities?

21  That doesn't make sense to me. It doesn't wash.

22        MR. GENSER: Well, the diminished capacity grounds has

23  to do with at the time of the offense. And it's not our contention that

24  he currently has a diminished capacity. It just was -- the offense was

25  committed at that time. I think there's a pretty ample record to justify

---

30

1   it. And since the parties agree to the ultimate disposition, we would

2   ask the Court to --

3         THE COURT: You see, I have to exercise my discretion.

4   I just find it counter intuitive. I'm trying to give you an intellectually

5   honest take on this.

6         Julius Nasso was a profound business person. He has

7   been involved in the entertainment business for many, many years. By

8   his own admission, he has produced four films subsequent to the

9   Steven Seagall split up. He had a longstanding relationship with Segall.

10  He was the engine behind his success in terms of the amount of movies

11  that were produced. And I just find it hard to believe that all of this

12  was accomplished and still is being accomplished by a person with

13  diminished mental capacity to justify significant departures under the

14  guidelines.

15        But what seems to be more compelling and a better

16  justification to support the plea agreement is my recollection that there

17  is no proof here that the demand upon Steven Segall rose to a $63

18  million level. I mean, if I recall correctly, they were talking about

19  getting him to pay $700,000.

20        MR. GENSER: It was $3 million,

21  your Honor.

22        THE COURT: They wanted him to pay $3 million? I

23  heard $700,000 during the course of the trial. I could have some

24  recollection of that. I could have a hearing.

25        But I don't find that there's a real strong basis to support a

---

Proceedings                                      31

1   seven level or a six level increase. I find based upon what I heard

2   during the trial, that fairness suggests that what happened here

3   consistent with the Jules Nasso plea agreement is that he was claiming

4   that, you know, Segall owed him $700,000. And that, you know, he

5   reached out to his brother to sort of get somebody to threaten him to

6   pay up the money. I recall $700,000 being the figure.

7         MR. GENSER: Your Honor, I don't recall that figure. I

8   think there was a tape where there was a discussion of Sonny Ciccone

9   stating that he wanted $150,000 per movie. And then there was

10  testimony that at one of the meetings, Mr. Ciccone told Steven Segall

11  that he owed him $3 million.

12        THE COURT: Well, maybe but I think that Jules was

13  really looking for $700,000. What Ciccone may have told them, who

14  knows? He could have told them $10 zillion.

15        MR. HANTMAN: Your Honor, if I may?

16        THE COURT: Yes.

17        MR. HANTMAN: With respect to that $150,000 per film,

18  that was never even communicated to Steven Segall and that's clear

19  from on the tape. It was conversations about this and Sonny said,

20  "Well, did you say this to him? Did you say it to him?"

21        And he said, "No, I never said this to him."

22        But we're really not here to retry the case. If we were to

23  retry the case,

24  your Honor knows in our submissions to

25  your Honor, it was our position that much of what was said at that

---

Proceedings                                      32

1   previous trial was not so corroborated. We do not believe it's true.

2         With respect to -- and we argued for a lower level and

3   then we reached an agreement with Mr. Genser and perhaps we're, I

4   wouldn't say nitpicking because the issues here are so crucial, I guess

5   for the government and also for Mr. Nasso.

6         But if I can also be heard,

7   your Honor, it's our position that there were some additional points

8   given by probation because they claimed that there were threats of

9   death or physical injuries.

10        THE COURT: Well, it's two points.

11        MR. HANTMAN: So, two points. But we believe that

12  those two points shouldn't even apply.

13        THE COURT: What should it be, one point? What kind

14  of a threats do you think your client is --

15        MR. HANTMAN: Well, there weren't.

16        THE COURT: Listen to me.

17        MR. HANTMAN: Yes.

18        THE COURT: What kind of threat based upon the

19  allocution that your client made was he contemplating being visited

20  upon Steven Segall?

21        MR. HANTMAN: Well, he was uncomfortable. Mr.

22  Segall's testimony was he felt uncomfortable. I think Mr. --

23        THE COURT: What did he mean by -- do you want me to

24  read your client's allocution to you again?

25        MR. HANTMAN: Your Honor, I'm talking about Mr.

Proceedings                                34

1   Segall's testimony in court that he was uncomfortable.

2          THE COURT: I don't care. I care about what your client

3   fessed up to.

4          MR. HANTMAN: And that would support the lower base

5   level, your Honor. And again, we're not here trying to take exception

6   to the agreed upon plea agreement with the government. We merely

7   want to convince the Court that the plea is a bona fide plea.

8          THE COURT: I'm telling you --

9          MR. HANTMAN: That it should be accepted by the Court.

10         THE COURT: Listen to me carefully. I am uncomfortable

11  in accepting the notion that Julius Nasso was a person of diminished

12  capacity and could not effectively function in the face of the fact that

13  this man has made millions of dollars, in the face of the fact that this

14  man is a profound business person, in the face of the fact that he went

15  on to make many films after the break up with Steven Segall.

16         As a matter of respect for the judicial responsibilities I

17  have, I cannot comfortably accept the fact that we're talking about a

18  person of diminished capacity. When I see people of diminished

19  capacity, I see different people. I see people with low IQs. I see

20  people who are borderline psychotic. I don't have any of that here.

21  This is a man who functions and probably still functions to this day.

22  What's he doing today?

23         DEFENDANT J. NASSO: Making films, your Honor.

24         THE COURT: Making films.

25         DEFENDANT J. NASSO: And my pharmaceutical

---

Proceedings                                34

1   company.

2          THE COURT: A man of diminished capacity.

3          MR. GENSER: Your Honor?

4          THE COURT: No problem putting together complex

5   financial deals to make films? I'm not going to accept that.

6          MR. GENSER: Your Honor, if I may perhaps clarify that.

7   I don't think it's any of the parties' contention that he lacked the

8   intellectual capacity to be a successful business person or to

9   understand things.

10         And perhaps maybe the caption for the downward

11  departure is not entirely in line with the grounds that we're arguing.

12         But I think that there is a very serious record here of

13  emotional disturbance that would have effected his judgment, that did

14  effect his judgment and that the defense contends and agrees did effect

15  his judgment at the time.

16         I mean, if that's not the grounds then your Honor is

17  correct. But I mean, that's the premise we've operating under.

18         MR. HANTMAN: Your Honor?

19         THE COURT: Here's what he said, by the way, when he

20  allocuted before

21  Judge Pohorelsky. "I participated in conversations as recorded on

22  surveillance tapes in regard to obtaining assistance involving a

23  business dispute with my partner, Steven Segall. Such disputes stem

24  from my claim that there was money owing to me from Steven Segall."

25         I don't think he ever claimed that $3 million was owed to

---

Proceedings                                35

1   him. I think he claimed that it was about $700,000. Okay.

2          What Ciccone may have said, you know, could be

3   something entirely different. But as far as Steven Segall's

4   involvement, I don't think he was claiming that he was owed $3

5   million. I don't remember anything like that. Let me continue.

6          "An understanding was reached between myself and other

7   participants involved in the conversations. This understanding was

8   that one of the participants in the conversations would make

9   statements to Segall that would be perceived by Steven Segall as a

10  threat intended to induce payments of the monies that I claim are still

11  due me, your Honor."

12         So obviously, Jules Nasso anticipated that somebody

13  would say things to Steven Segall that would threaten him to part with

14  substantial sums of money. Now, I don't know whether that threat was

15  of bodily harm or death. There's nothing here to tell me that other than

16  what was testified to, I guess during the trial that they were sort of

17  joking about the fact that, you know, they were going to kill him or do

18  harm to him.

19         But in terms of what Julius Nasso understood, he was

20  willing to allow Segall to be threatened by the likes of Ciccone and

21  Casserino or whoever else. And that's a serious allocution to a serious

22  crime.

23         He was the one that was willing to use the "gangsters" so-

24  to-speak or whatever it took to get Segall to pay him money, not to use

25  the courts to bring civil litigation for that purpose but to threaten this

---

Proceedings                                36

1   person. That's serious business.

2          MR. HANTMAN: Your Honor, may I say something?

3          THE COURT: And you make light of it and I do not make

4   light of it.

5          DEFENDANT J. NASSO: Your Honor, may I say

6   something?

7          MR. GENSER: Your Honor?

8          THE COURT: Yes, let me hear from you.

9          DEFENDANT J. NASSO: Your Honor, I've been a law

10  abiding citizen all of my life, sir. I've motivated children at colleges

11  throughout universities. Am I under oath, your Honor?

12         THE COURT: Well, do you wish to have your client

13  speak here?

14         MR. HANTMAN: Oh, I thought you directed --

15         DEFENDANT J. NASSO: I want to speak.

16         MR. HANTMAN: You wanted to hear from him.

17         DEFENDANT J. NASSO: I would like to speak.

18         THE COURT: You should talk to your lawyer first

19  because whatever you say --

20         DEFENDANT J. NASSO: No, I want to speak to his

21  Honor.

22         THE COURT: -- could have an effect upon what I do.

23         MR. GENSER: Your Honor?

24         DEFENDANT J. NASSO: I would like to speak to his

25  Honor if --

37

1 THE COURT: One second.

2 DEFENDANT J. NASSO: -- Mr. Genser is referring to my

3 mental capacity.

4 THE COURT: Talk to your client first.

5 DEFENDANT J. NASSO: Thank you, sir.

6 THE COURT: Talk to your lawyer.

7 MR. HANTMAN: Your Honor, if we could have -- your

8 Honor, it's exactly for these reasons why we wanted an adjournment

9 to try to work out some of these issues because frankly, we believe that

10 the guideline should be so far lowered that even within the guidelines,

11 Mr. Nasso would be entitled to probation.

12 THE COURT: That would be a different cup of tea. I'm

13 looking at a significant disparity here and that troubles me.

14 DEFENDANT J. NASSO: Your Honor, may be able to say

15 something?

16 THE COURT: So you can talk. If you can agree amongst

17 yourselves that, for example, under 11(e)(1)(C), that seven level

18 enhancement should not be applicable or do you want to agree that two

19 levels should not be applicable in terms of threats of death. You can

20 talk to each other about that. I am prepared to make a ruling, I think,

21 if push came to shove.

22 But I think it's more probable that a three level

23 enhancement in paragraph 244 than a seven level enhancement squares

24 with the reality of what I heard during the course of the trial.

25 MR. GENSER: We don't have a problem with that as to

Transcription Plus II     Rosalie Lombardi

---

38

1 Mr. Nasso.

2 THE COURT: Just one minute.

3 MR. HANTMAN: No.

4 MR. GENSER: -- if that makes the difference, your

5 Honor.

6 DEFENDANT J. NASSO: Can I just say something?

7 THE COURT: Wait. Listen to me. Don't say anything.

8 So, if since the government agrees and there's no

9 disagreement by counsel that three levels would more fairly reflect the

10 specific offense characteristic in terms of the amount of monies

11 involved, then leaving alone the two levels for threat of bodily harm, I

12 think that would still apply two levels; right?

13 MR. GENSER: Yes, your Honor.

14 THE COURT: Then we would be dealing with an offense

15 level of 21 instead of 24. There's a global plea agreement.

16 MR. GENSER: Yes, your Honor.

17 THE COURT: That was part of the mix.

18 MR. GENSER: Yes, your Honor.

19 THE COURT: The government has taken the position that

20 one level departure is warranted for all of the people who

21 accommodated the global plea agreement.

22 MR. GENSER: Yes, your Honor.

23 THE COURT: That would bring us down to a level 20.

24 That would then bring us to a range of imprisonment --

25 MR. HANTMAN: 33 to 41 months.

Transcription Plus II     Rosalie Lombardi

---

Proceedings     39

1 THE COURT: -- of 33 to 41 months.

2 MR. HANTMAN: Your Honor, we would suggest and it

3 says detailed in our submission that there are additional points that

4 should be reduced which again I think we --

5 THE COURT: Why?

6 MR. HANTMAN: Well, with respect to the threat of death

7 --

8 THE COURT: That's two points.

9 MR. HANTMAN: Yes, okay, two points. That's number

10 one.

11 THE COURT: Well, what if it was bodily harm?

12 MR. HANTMAN: Exactly, okay.

13 THE COURT: If it was bodily harm, would it still be two

14 points? Yes.

15 MR. HANTMAN: Okay. So, you take two points there.

16 THE COURT: Why should I take two points? He's --

17 what's the difference?

18 MR. HANTMAN: No, Judge, there would be no two point

19 enhancement. There was a two point enhancement. There should be --

20 MR. GENSER: Your Honor, may I speak to Mr. Hantman?

21 THE COURT: Just one second.

22 MR. HANTMAN: There was a --

23 THE COURT: How much do you think should --

24 MR. HANTMAN: -- two point enhancement, your Honor.

25 THE COURT: What do you think it should be?

Transcription Plus II     Rosalie Lombardi

---

Proceedings     40

1 MR. HANTMAN: There shouldn't be an enhancement.

2 THE COURT: He sent people out to threaten him. What

3 do you mean? What is a threat? Threatening how?

4 DEFENDANT J. NASSO: Can I answer the Judge? It's

5 my life and I've got to answer the Judge.

6 MR. HANTMAN: Your Honor, we believe and my client

7 is adamant that there were no threats to his life or any --

8 THE COURT: What else?

9 MR. HANTMAN: Okay. Also, if I could be heard, also

10 your Honor for the lost profits, again the point should be zero. He also

11 --

12 THE COURT: Look, Mr. Hantman, you've got serious

13 problems here. Don't make silly comments. There's a loss involved.

14 He wanted money to be paid to him. How can you with a straight face

15 tell me that I should not take that into consideration? How can you

16 with a straight face tell me I should not consider it a threat or the

17 underlying nature of a threat? How can you say that with a straight

18 face?

19 MR. HANTMAN: Well, we're --

20 MR. GENSER: Your Honor?

21 MR. HANTMAN: You're indicating -- it's our contention

22 our client did not make any threats to Mr. Segall.

23 MR. GENSER: It's a conspiracy.

24 MR. HANTMAN: Now, your Honor may be right that

25 somebody else said something. Mr. --

Transcription Plus II     Rosalie Lombardi

## Proceedings 41

1      THE COURT: He allocuted to the fact that he authorized

2 that threats be made to induce Segall to pay up money. Instead of

3 using the civil judicial process, he was going to take the law into his

4 own hands.

5      MR. GENSER: Your Honor, may I have a moment to

6 speak to Mr. Hantman one more time?

7      THE COURT: Go ahead.

8      MR. GENSER: Thank you, your Honor.

9      DEFENDANT J. NASSO: Your Honor, could I --

10      THE COURT: No, you can't talk without your attorney

11 allowing you.

12      DEFENDANT J. NASSO: Please, I want to talk to the

13 Judge.

14      (Pause in proceedings)

15      (Discussion held off the record)

16      MR. GENSER: Mr. Hantman will confirm that in light of

17 the government's concession concerning the loss figure with respect to

18 Mr. Julius Nasso that there are no further disputes concerning the

19 sentence calculation. And we submit that the downward departure

20 from the 30 month range that the guidelines provides for to the one

21 year and a day in the plea agreement is justified.

22      THE COURT: So, we're now on a 33 to 41 range is what

23 we're talking about, not 51 or whatever; right?

24      MR. GENSER: I think that's -- it's 33 to 41, your Honor.

25      THE COURT: Now let's move forward. I think we're

Transcription Plus II    Rosalie Lombardi

## Proceedings 42

1 making some progress. You have a good understanding, Mr. Haffman

2 (sic) --

3      MR. HANTMAN: Mr. Hantman.

4      THE COURT: I'm sorry, Mr. Hantman, that I'm troubled

5 by your client's behavior. I have to now, you know, decide whether to

6 accept the plea agreement.

7 Magistrate Judge Pohorelsky recommended that I do so. And

8 regardless of how else we proceed, I have to make that separate

9 determination.

10      Based upon the transcript that I have reviewed of the

11 proceedings before

12 Magistrate Judge Pohorelsky and in particular the allocution which I

13 just read, I find that yes, your client has allocuted to the crime to

14 which he has pled guilty and I will accept the recommendation of the

15 magistrate judge that I accept the plea. So, we have established that. I

16 think there is a basis for it.

17      And I do believe that basically what we're dealing with

18 here is a business scenario where Jules Nasso reached out to his

19 brother, Vincent Nasso, who apparently he believed was connected to

20 the Mafia or people of ill repute to help him collect the debt by use of

21 threats, okay? I believe that. And he pled to that and he's guilty. He

22 is going to be sentenced because of that.

23      Now the question is whether or not I'm comfortable in

24 going from 33 months to a year and a day. It depends upon how

25 compelling the downward departure application is. And the

Transcription Plus II    Rosalie Lombardi

## Proceedings 43

1 government, you know, points to what you believe to be sufficient

2 basis that even if he were to be sentenced within the range of 33 to 41

3 months, there is considerable support for the notion that the Court

4 would exercise its discretion under the unique circumstances of this

5 case to downwardly depart to a sentence somewhat in the range of the

6 agreement. I think that's your position.

7      MR. GENSER: That's the government's position.

8      THE COURT: I now put forward on the record knowing

9 that I am somewhat concerned about the fact that Mr. Nasso standing

10 before me seems perfectly competent, perfectly capable of performing

11 complex business transactions, that I find it somewhat superficially at

12 least disingenuous that you're telling me that he didn't have the mental

13 capacity at the time to engage in this particular criminal activity. So,

14 make a record right now. Then I'll consider whether or not I will agree

15 with the plea.

16      MR. GENSER: Your Honor, as the government

17 understands it, just prior to the offense in this case, Mr. Nasso had

18 some traumas in his personal life involving a split up that triggered

19 some -- the manifestation of some emotional conditions. It's detailed

20 in the presentence report in great detail. He's been interviewed. The

21 government has been provided with medical records documenting this.

22 It's very specific. It's very acute.

23      He was experiencing anxiety attacks, panic attacks,

24 depression, withdrawal. All kinds of very, very serious emotional

25 disturbances.

Transcription Plus II    Rosalie Lombardi

## Proceedings 44

1      And I agree with the Court when the defense first

2 presented the material to the government, we were skeptical but we

3 read it. We listened to the tapes that we had from the trial in which it

4 was discussed that Julius Nasso was in an extreme deep depression

5 during the time. And we think that those medical issues were a

6 significant contributing factor to the change in his conduct from a law

7 abiding business man to someone that fell in with the wrong crowd and

8 made a terrible mistake.

9      THE COURT: Also that there's a good degree of aberrant

10 behavior associated with that activity on his part.

11      MR. GENSER: There is a mix in that. There is that in the

12 mix.

13      THE COURT: So, what you're saying basically is that

14 even if, you know, I were to depart down to a year and a day from the

15 lower range of 33 months based upon aberrant behavior and all of these

16 other factors which are elaborately set forth in the papers that I have

17 before me and the extensive submissions that counsel has furnished,

18 that the Court would not appeal to the second circuit claiming that I

19 abused my discretion.

20      MR. GENSER: The government would not. The

21 government has agreed to the sentence.

22      THE COURT: The government would not.

23      MR. GENSER: And --

24      THE COURT: No, even if there were no agreed sentence

25 that you think a departure would be warranted and you will not appeal

Transcription Plus II    Rosalie Lombardi

Proceedings 45

1  to the circuit court claiming that the Court abused its discretion.

2  MR. GENSER: That's correct,

3  your Honor.

4  THE COURT: Do you want to add anything at all, Mr.

5  Hantman?

6  MR. HANTMAN: Yes, your Honor. I think since we're on

7  the subject, on page 67 of the PSI report there is a summary from

8  the probation office, a very excellent summary, your Honor, paragraph

9  272.

10  THE COURT: Well, let's read it for the record. "Finally,

11  Dr. Drobb asserted that because of his dependency and helplessness

12  when stressed, the defendant is vulnerable to being manipulated by

13  those whom he imagines to be the source of his salvation. Because he

14  has substantial difficulty thinking clearly and logically, his escapist

15  fantasies are likely to involve considerable distortion of what is

16  realistically plausible or possible. He is at risk for coming to

17  conclusions hastily after only cursory attention to relevant

18  considerations, for working careless and feeling satisfied with final

19  products that do not reflect the measure of his ability and for scanning

20  situations in a cursory manner that takes insufficient account of

21  considerations he should notice.

22  "These factors directly and significantly contributed to

23  the defendant's decision to seek out the assistance of another person

24  and to rely upon his judgment in coping with a matter that he should

25  have placed in the hands of lawyers and authorities."

Proceedings 46

1  Well, it's kind of wordy. But do you know what I find to

2  be more compelling is that there's nothing at all that indicates in this

3  person's career, his background, his history, his personal life, that his

4  behavior was anything short of aberrational under the circumstances.

5  So, I think a more appropriate basis for a departure would

6  be 5k2.20 because this is a singular decision made pretty hastily,

7  totally at odds with his lifestyle, with his other good deeds and I think

8  it really smacks of aberrant behavior more than anything else.

9  But given that there is medical support for this position, I

10  will give it some credit but I would be comfortable in downwardly

11  departing on the grounds of aberrant behavior in this particular case.

12  So, because of that, I am willing to accept the agreed plea

13  to a year and a day but I just want the record to be clear. I find that to

14  be more compelling than the notion that this person was not really

15  capable of functioning in making business judgments; okay?

16  MR. HANTMAN: Your Honor, frankly, we would agree

17  with you 100 percent and that's always been our position. We took

18  great pains. I know that Mr. Nasso's reputation means so much to him

19  and as your Honor pointed out, he's been law abiding. He's contributed

20  his entire life to numerous charities. He's raised millions of dollars

21  for charities.

22  THE COURT: He's done all of that.

23  MR. HANTMAN: Exactly. Plus,

24  your Honor, you know even the people he's worked with from the film

25  company, from Warner Brothers, the chief executives that he's worked

Proceedings 47

1  with, even employees of the Segall/Nasso organization, there are over

2  49 letters sent directly to your Honor, people who worked with him

3  over a lifetime who would attest to his integrity, his character, his

4  honesty.

5  In addition to that, your Honor,

6  Mr. Nasso and I've seen him the last year, year and a half with

7  different people, most people love the man. He doesn't have a violent

8  bone in his body. And we would suggest and we would agree with your

9  Honor, this behavior was so aberrational it would never happen again.

10  And I think the reason it happened was because Mr. Nasso at the time

11  felt his own life was in fear. I need not go into that at this point. It's

12  adequately in our papers. But he would never do this again. I know

13  he's remorseful and would like to put this behind us.

14  THE COURT: He knows. When we look at 5k2.20 which

15  informs the Court about how to view aberrant behavior departure, the

16  commentary instructs the Court that aberrant behavior means a single

17  criminal occurrence or single criminal transaction that was committed

18  without significant planning, was of limited duration and represents a

19  marked deviation by the defendant from an otherwise law abiding life.

20  That is what we have presented to the Court in respect to

21  Jules Nasso. That's the reason essentially that I am going to accept the

22  year and a day plea agreement. I just want the record to be clear about

23  that.

24  Let's proceed. I take it your client is prepared to be

25  sentenced today,

Proceedings 48

1  Mr. Hantman?

2  MR. HANTMAN: Yes, your Honor.

3  THE COURT: All right. We have attended to the

4  colloquy that I find necessary and comfortable in terms of the

5  guidelines calculation. We're beyond that right now. I'm willing to

6  accept the year and a day and to enforce the plea agreement that you

7  folks have entered into.

8  But let's return to that agreement. There are a few things

9  else to button down. Tell me about the $75,000. Has that been paid?

10  MR. HANTMAN: Your Honor, we're prepared to pay,

11  THE COURT: The plea agreement provides that the

12  defendant will forthwith pay the $100 special assessment.

13  MR. HANTMAN: We're prepared to pay it today, your

14  Honor.

15  THE COURT: And agrees to pay the $75,000 fine at or

16  prior to sentencing. Has that been paid yet?

17  MR. HANTMAN: Your Honor, frankly, my client was

18  going to bring in a check here. He was very nervous today. He didn't

19  bring it. We'll make arrangements for it to be wired.

20  MR. GENSER: There's no problem with that. We'll give

21  a couple of weeks,

22  your Honor.

23  THE COURT: I just want to make sure of that.

24  There is no -- provision, I don't find any at least in the

25  plea agreement governing supervised release. So that really rests in

## Proceedings 49

the Court's discretion, I take it.

    MR. GENSER: Correct.

    THE COURT: All right.

    Mr. Hantman, do you wish to comment to that?

    MR. HANTMAN: Yes, your Honor, we would ask for the absolute minimum or maybe none at all. As your Honor knows, been during the time he's been on bail, MR. Nasso has always complied with all of the requirements. We've written letters to your Honor, to Mr. Genser. He's been exemplary in honoring all of his responsibilities.

    We believe that because of the nature of his business and because he would never be involved in something like this again, that there's really no need for him to be under any supervision.

    THE COURT: Does the government have a decision in respect to that?

    MR. GENSER: Your Honor, I think that some brief period of supervision would be appropriate, just to make sure that he's on the right track.

    THE COURT: Yes, the probation office recommends three years. It may well be that I don't think that's necessary but it talks about a non-association provision which I think is appropriate. And also, since he has some mental health problems that he shall participate in mental health treatment with a treatment provider selected by the probation department in its discretion. So, I think that's consistent with your contention that he has these types of

## Proceedings 50

problems.

    MR. HANTMAN: Well, let me just clarify it. I think some of these problems were exacerbated or what contributes to them is stress of things other than his day to day life.

    THE COURT: Right, but you know I am sure that you're not going to now tell me that he has no mental problems.

    MR. HANTMAN: No, of course not.

    THE COURT: That he's not in need of any continued treatment.

    MR. HANTMAN: No, of course not, your Honor, but I am just indicating that in normal circumstances without outside threats when he is left to his own doing his business, it can be -- it's treatable.

    THE COURT: So now what we're going to do since I've accepted the plea, I'm going to listen to whatever else you want to say. Mr. Hantman be careful before you change my mind.

    And what do you wish to do in terms of the PSR? I know and I can understand that you take exception to many references that say that Jules Nasso is a Gambino family associate or an associate to organized crime figures. I can understand why you may be concerned about that.

    Have you decided amongst yourselves what, if anything, should be done in respect to the many requests that you've made of the Court to rearrange or to redact or to sanitize the PSR in respect to your client?

## Proceedings 51

    MR. HANTMAN: Well, your Honor, we appreciate that and of course it's important to Mr. Nasso and important, I think, to the government, too.

    I think we can agree upon that on another day to sanitize the record. Our position is clear. I don't want to burden the Court with going through each of our points.

    THE COURT: Let me suggest this. You stated your position.

    MR. HANTMAN: Exactly.

    THE COURT: We have your papers. The PSR has set forth its position. The Court is going to accept the year and a day not necessarily because of all of these factual statements set forth in the PSR. I'm not going to necessarily credit those. So, the record will disclose that I haven't endorsed each and every factual finding of the PSR. I've made reference to how I am calculating the guidelines. That's sufficient. Any reference to organized crime, I'm not necessarily endorsing that whatsoever. And I don't think that the PSR is the last word in respect to that. So, I think you have the record. You don't have to deal with that. I don't have to get involved in making determinations about that under the circumstances of this case.

    Does that suffice?

    MR. GENSER: Yes, your Honor. I think you should incorporate his objections to it as part of the PSR. That's no problem. We have --

    THE COURT: We'll do that. I don't want any further

## Proceedings 52

submissions or any requests to sanitize the PSR. Let the record that we're making in court today suffice; okay?

    MR. HANTMAN: Your Honor, we would like for licensing purposes to have some kind of a letter. I don't think the Court's going to issue that kind of a letter but we've discussed this with Mr. Genser and it's not an issue we have to discuss now.

    MR. GENSER: Your Honor, whatever is in the PSR is confidential. It is not disclosed to the public. I just don't think we need to go there.

    THE COURT: It's confidential. I made reference to some parts of the PSR by necessity in terms of the colloquy we had. But the rest of it is confidential.

    I will say this, I don't recall any hard evidence that would satisfy the Court that if I had to rule on the issue factually that Jules Nasso is an associate of organized crime. So, you have that statement by me.

    MR. HANTMAN: Thank you, your Honor.

    THE COURT: Let it go. Okay?

    MR. HANTMAN: Thank you, your Honor.

    DEFENDANT J. NASSO: Thank you very much.

    THE COURT: And is there anything else you wish to say before I turn to your client? He has the right to speak at that time before sentence is imposed.

    MR. HANTMAN: Your Honor, yes, I would like to be brief given the history of this case and I know it's important for my

Proceedings 53

1 client to put this on the record, however, briefly.

2 Today is the end of a sad chapter for Mr. Nasso and the

3 opportunity for a new beginning. It's always a tragedy when people

4 who respected each other, who were best friends and contributed so

5 much to each other's lives have come so far apart. No doubt they

6 would turn back the clock if they could.

7 Mr. Nasso's entire life has been devoted to being a law

8 abiding, hard working deeply committed son, businessman, husband,

9 father to two sons, employer and employee.

10 As I indicated to you, he's worked hard his whole life.

11 He's graduated school. He's made something of himself in business

12 and later in the movie industry, first in the pharmaceutical business

13 and later in the movie industry.

14 We're not here to reargue anything. We accept your

15 Honor's decision and we stand by it. We would want to indicate in that

16 we appreciate the time you took to read the 49 letters that were sent to

17 your Honor.

18 THE COURT: Well, I didn't read all of them. You know,

19 some of them I sort of scanned through.

20 MR. HANTMAN: Okay. Well --

21 THE COURT: But I am aware of the bulk of the material

22 and I read representational letters. I don't want to, you know, deceive

23 you into thinking that every single line was written but in substance, I

24 am aware of what was said on his behalf.

25 MR. HANTMAN: Well, your Honor, the one thing all of

---

Proceedings 54

1 the letters from law enforcement, community leaders and colleagues,

2 the one thing in which they share and that basically I just read three

3 excerpts of three of the letters only, your Honor --

4 THE COURT: Go ahead.

5 MR. HANTMAN: -- which I think reflect everybody or

6 almost everybody who has ever dealt with Mr. Nasso. According to

7 Philip Goldfarb, producer of Hill Street Blues, L.A. Law, NYPD, "I am

8 writing on behalf of Julius Nasso who I have known for the past 15

9 years. During the entire time I have known Julius, I found him to be a

10 gentleman of the highest standards, a hard working and sincere

11 individual who has great regard for our profession and demonstrated to

12 me his ethical nature and generous spirit."

13 This was also in different words but the sentiments were

14 the same by the director for The Fire Down Below, also -- for all of the

15 movies. That's not our purpose to go through the whole history. Just

16 two more letters, your Honor, and I'll be brief. But this whole man's

17 life has been traumatized by something which he certainly regrets and

18 is remorseful for.

19 "I have known Julius Nasso about 14 years. I have come

20 to respect him as both a professional and a friend. He is very much

21 involved in the community activities. He is benevolent with his

22 support of charitable causes. The night he received the Ellis Island

23 Medal of Honor for Outstanding Americans, that award alone should

24 serve as a testament to his many contributions to society." From

25 Marvin Scott, from WPIX.

---

Proceedings 55

1 And finally, your Honor, this will be the last, according to

2 Steve Perry, the academy award winner of Rocky and somebody who

3 was going to make a movie with Mr. Nasso, "Presidents of studios,

4 captains of industry, they all respect Jules for his integrity, his

5 common sense approach to life in general, as well as his friendship."

6 On behalf of Mr. Nasso, his family, friends, colleagues

7 and employees, we thank your Honor for considering all of these

8 factors and having accepted the plea agreement so Mr. Nasso can put

9 this chapter behind him and go forward for the rest of his days and

10 continue to be a positive influence and make a substantial contribution

11 as he has always done in the past to the community, society and

12 country he so dearly loves.

13 THE COURT: Now, Mr. Nasso --

14 DEFENDANT J. NASSO: Yes, your Honor.

15 THE COURT: -- you have the right to speak now before

16 sentence is imposed.

17 DEFENDANT J. NASSO: Yes, your Honor.

18 THE COURT: I encourage you to speak to your lawyer

19 before because we're talking about a lot of possibly complex

20 sentencing concerns here and I don't want you to be at risk for saying

21 things which may not enure to your benefit. But now you could speak.

22 But you know my concern.

23 DEFENDANT J. NASSO: Yes, your Honor.

24 THE COURT: You know that I have accepted the

25 negotiated plea agreement primarily because I consider your behavior

---

Proceedings 56

1 to be aberrational. You know also that I don't condone that behavior.

2 A man of your resources, of your sophistication, of your talents, of

3 your success could have easily as apparently you have subsequently, I

4 guess, reached out to the law in a proper way to get redress as a result

5 of the differences, whatever they may have been, between you and your

6 partner, Mr. Segall.

7 Instead, doing what I consider to be an aberrational aspect

8 of your life, you decided to reach out to your brother apparently

9 because I assume you sense that he was connected for lack of a better

10 word, that you would be able to use forces outside of the law to get Mr.

11 Segall to pay you the monies which you believe rightfully or

12 wrongfully were yours.

13 And that's a serious crime. That's why I've labored so

14 long today to give it the seriousness of purpose which I feel it

15 warrants. You know my thinking about this and nonetheless, this is

16 your time to speak before sentence is imposed. You already know what

17 the sentence is going to be but nonetheless, you can speak.

18 DEFENDANT J. NASSO: Thank you,

19 your Honor. Your Honor, I am very remorseful for what has occurred.

20 I have been a law abiding citizen all of my life, your Honor. This is

21 the first time I have ever been in front of a judge or in a courthouse,

22 not even in a traffic violation.

23 I've always been pro law enforcement from all the records

24 that have been shown to you, your Honor, not only in my movies that I

25 make but also in the numerous fund raisers that I have done for widows

---

**Proceedings** 57

1  of policemen officers, as well as military, both American and Israeli

2  soldiers for their families because growing up, losing a father at a

3  young age and making a promise to my dad that a reputation could

4  never be made as much as money and a reputation is worth more than

5  the money, your Honor. And that's why I devoted 25 years of my life

6  to charities and raised more than millions of dollars, your Honor, for

7  25 years. I still continue to do so.

8         And I place my fate in your hands,

9  your Honor and I promise you that this will be the first and last time I

10  will ever see a courthouse with the exception of maybe one that I might

11  build some day in a set.

12         MR. HANTMAN: Don't say that.

13         DEFENDANT J. NASSO: I'm only joking there, sir I'm

14  sorry. It was just a

15  little --

16         THE COURT: No, that's all right. You show a human

17  face. There's nothing inappropriate about that.

18         DEFENDANT J. NASSO: It's just a little humanity to it,

19  your Honor.

20         THE COURT: It's okay. All right. The sentence as I

21  already have indicated that I'm going to impose will be pursuant to the

22  agreed upon the plea, pursuant to 11(c)(1)(C) of the federal criminal

23  procedure law and as a result of that, you will be sentenced to a year

24  and a day of incarceration.

25         I'm going to require one year of supervised release

Transcription Plus II      Rosalie Lombardi

---

**Proceedings** 58

1  subsequent to your release from incarceration with the following

2  special conditions. Even though I see no strong evidence, as I

3  mentioned before, that you are an associate, whatever that means, of

4  organized crime --

5         DEFENDANT J. NASSO: Thank you.

6         THE COURT: -- nonetheless, since you did reach out to

7  criminal elements, I am going to require as a special condition of your

8  supervised release during that one year period that you will not

9  associate in person, through mail, electronic mail or telephone, with

10  any individual with an affiliation to any organized crime groups, gangs

11  or any other criminal enterprise, nor shall you frequent any

12  establishment or other locale where these groups may meet pursuant

13  but not limited to a prohibition list provided by the probation

14  department.

15         A second special condition of supervised release which is

16  that you shall participate in mental health treatment with a treatment

17  provider selected by the probation department in the exercise of the

18  discretion by the probation department. You shall contribute to the

19  cost of services rendered for any psychotropic medications prescribed

20  be it a co-payment or full payment in an amount to be determined by

21  the probation department.

22         There's a $100 special assessment which is to be paid

23  forthwith. There is also a $75,000 fine which would be paid forthwith,

24  as well. I expect that to be done within the next few days based upon

25  counsel's representation.

Transcription Plus II      Rosalie Lombardi

---

**Proceedings** 59

1         And there are general conditions of supervised release

2  which automatically abide the event. The clerk of the court is handing

3  them to you know. There are 14 in number. You are to read them

4  carefully and make sure you comply with them.

5         DEFENDANT J. NASSO: Yes, your Honor.

6         THE COURT: And, for example, you know, you shall not

7  commit any other criminal acts.

8         DEFENDANT J. NASSO: Never.

9         THE COURT: So, make sure you read those general

10  conditions. Now you have waived your right to appeal in the plea

11  agreement. However, There's a window of opportunity that the Circuit

12  Court of Appeals has articulated would be available to you in the event

13  that any basic rights, constitutional rights of yours have been violated.

14  I know of none but if you think that you come under that umbrella, you

15  then can appeal and you do so by filing a notice of appeal within ten

16  days after written judgment is entered. And you'll have to perfect it

17  within 30 days thereafter unless you get an extension. Your skilled

18  counsel knows how to advise you in respect of all of that.

19         Counsel, I don't think there are any

20  -- there are charges pending here. I guess we have to dismiss the

21  underlying indictment insofar as it otherwise charges him with

22  criminal activities.

23         MR. GENSER: Yes, your Honor. The government before

24  we make that motion would like to complete the sentence of Vincent

25  Nasso, as well, your Honor.

Transcription Plus II      Rosalie      rdi

---

**Proceedings** 60

1         THE COURT: Well, just one second. There will be no

2  interest on the fine. We are going to allow you to surrender. There's

3  no need for you to be remanded on the spot. I assume the government

4  is in agreement with that.

5         Normally, it takes about six weeks for a designation to be

6  made. I'll give you six weeks to surrender. I'll also recommend under

7  the circumstances to the Bureau of Prison that you will be confined to

8  a minimum security facility. I'm not going to tell them where that

9  facility ought to be. I don't want to impose excessively upon their

10  discretion. I don't want to impose at all upon their discretion but

11  that's the recommendation.

12         Anything else now?

13         MR. HANTMAN: Yes, your Honor, we would just like to

14  ask that your Honor recommend to the Bureau of Prisons that

15  Mr. Nasso be designated to serve his sentence at the federal

16  correctional institution Schuylkill in Minersville, Pennsylvania.

17         THE COURT: I'm going to let the BOP decide that. I

18  recommended a minimum security facility; okay?

19         MR. HANTMAN: Okay. And, your Honor, a surrender

20  date if you could of August 20 because Mr. Nasso has to finish up

21  certain projects he's involved with right now.

22         THE COURT: Well, I was going to say six weeks. That

23  would bring us into April.

24         THE CLERK: That would be April 2.

25         THE COURT: April 2.

Transcription Plus II      Rosalie Lombardi

62

1   MR. HANTMAN: But, your Honor, if the government

2   doesn't have any objection, could we respectfully request that because

3   of the different activities that Mr. Nasso's involved with that it be

4   longer?

5   THE COURT: Mr. Genser, does the government have a

6   position?

7   MR. GENSER: We don't have a position on it, your

8   Honor.

9   THE COURT: You're willing to accommodate an August 2

10  surrender?

11  MR. GENSER: That's fine.

12  THE COURT: August 2. No extension. I don't want to

13  get letters asking me for additional time. I've given you considerable

14  leeway right now. That's all I am going to do.

15  MR. HANTMAN: Thank you, your Honor.

16  MR. GENSER: Thank you, your Honor.

17  THE COURT: Now, Mr. Genser, isn't there something

18  that's pending against him?

19  MR. GENSER: Yes, your Honor. We would just reserve

20  on that until we're completed with Mr. Vincent Nasso's sentencing.

21  THE COURT: Well, why? I mean I want to complete his

22  sentence. It stands alone. And I think we have to do that.

23  MR. GENSER: It's because of the global nature of the

24  plea. If the Court rejects Mr. Vincent Nasso's sentence, the

25  government would have the right to withdraw the plea with respect to

Transcription Plus II    Rosalie Lombardi

---

1   this and go forward on the remaining counts.

2   THE COURT: Well, that would get involved with a whole

3   bunch of sticky issues, I suspect. But in any event, the record is clear

4   as to what he has pled to. And let's work on the assumption that

5   Vincent Nasso will take a plea. If not, if there's a problem with the

6   formal dismissal of the other count, we'll have to address that at a

7   subsequent time, I suspect.

8   MR. GENSER: Yes, your Honor.

9   THE COURT: Anybody else wish to say anything?

10  DEFENDANT J. NASSO: Your Honor, I just want to

11  thank you, sir, for helping me and acknowledging that I am not part of

12  organized crime. That's important to me more than anything else, sir.

13  THE COURT: I don't know what associate of organized

14  crime exactly means. It's a word subject to various different

15  interpretations. But from what you have done, reaching out to your

16  brother, I don't find that to be sufficient --

17  DEFENDANT J. NASSO: Thank you, sir.

18  THE COURT: -- to constitute association with organized

19  crime.

20  DEFENDANT J. NASSO: Thank you,

21  your Honor.

22  MR. HANTMAN: Thank you, your Honor.

23  THE COURT: All right. That completes the sentence.

24  Let's take 15 minutes before we return to Vincent Nasso.

25  (Recess)

Transcription Plus II    Rosalie Lombardi

---

Proceedings    63

1   THE CLERK: Second call, Criminal Cause for Sentencing

2   , United States of America v. Vincent Nasso.

3   MR. LEVIN: Good afternoon,

4   your Honor.

5   Barry Levin for Vincent Nasso.

6   MR. GENSER: Andrew Genser for the United States.

7   Good afternoon, your Honor.

8   Your Honor, after --

9   THE COURT: Mr. Levin, what do you have to report to

10  the Court in light of our conversation?

11  MR. LEVIN: Your Honor, I have been able during the

12  break to work out the issues with Mr. Genser and I believe we are in

13  agreement on going forward and we agree to the following.

14  The fine subject, of course, to

15  your Honor's approval will be converted to restitution.

16  MR. GENSER: That's correct,

17  your Honor.

18  MR. LEVIN: I will --

19  THE COURT: Who are the victims?

20  MR. GENSER: MYLA.

21  THE COURT: MYLA still is in existence and --

22  MR. GENSER: Yes, your Honor.

23  MR. LEVIN: Yes, your Honor.

24  THE COURT: -- the monies will be paid to the chief

25  financial officer, I guess.

Transcription Plus II    Rosalie Lombardi

---

Proceedings    64

1   MR. GENSER: To the fund; yes.

2   MR. LEVIN: It's --

3   THE COURT: To the fund.

4   MR. LEVIN: I think it's MYSLA. I represent to the Court

5   that Mr. Nasso has already given me the $250,000 and it's in my escrow

6   account.

7   We also have a --

8   THE COURT: Just go slow.

9   MR. LEVIN: I'm sorry.

10  THE COURT: Because in the judgment, I need to have the

11  specific name and address of where the monies will be paid.

12  MR. LEVIN: I understand, your Honor.

13  THE COURT: So, if you could furnish that to me now, I

14  would appreciate that.

15  MR. LEVIN: You want it right now or at the end of the

16  proceeding?

17  THE COURT: Yes, let's do it now so we can wrap up the

18  judgment in one fell sweep.

19  MR. GENSER: Your Honor, let me see if I have the

20  address.

21  THE COURT: If you have it. If you don't, we'll deal with

22  it.

23  MR. LEVIN: Your Honor, I have it right here.

24  THE COURT: All right.

25  MR. GENSER: Yes, your Honor, I think it would be -- I

Transcription Plus II    Rosalie Lombardi

**Proceedings** 66

1  think for purposes of doing the judgment, the money should be payable

2  to MYLA and the check can be delivered to MYLA's law firm, since it

3  is a legal entity which is Lamboise & Young. It's represented by

4  William Spellman. And I think it should be delivered to the law firm

5  and then they can transmit it to their client pursuant to their fiduciary

6  obligations.

7  THE COURT: All right, if everyone's in agreement to

8  that. And the address of the law firm?

9  MR. GENSER: Lamboise & Young. I don't know that I

10  have that but I can provide that as soon as I get back to my office.

11  MR. LEVIN: I have that in another document. That was

12  the address -- we'll provide it to you.

13  THE COURT: The law firm understands that it is to

14  deliver the monies -- they're holding the monies in a trust capacity for

15  proper delivery to the MYLA representative who is in charge of the

16  funds.

17  MR. GENSER: Yes, your Honor. Yes, they will act as

18  MYLA's agent for purposes of receiving the restitution and they will

19  deposit it into MYLA's account.

20  MR. LEVIN: Your Honor actually does have it. We have

21  submitted it as attached to the probation report.

22  THE COURT: Look, we don't have to quibble over it.

23  MR. LEVIN: All right.

24  THE COURT: I mean, we have the name of the law firm.

25  MR. LEVIN: Right.

---

66

1  THE COURT: And the address is here. I have lots of

2  submissions.

3  MR. LEVIN: I understand,

4  your Honor.

5  THE COURT: All right.

6  MR. LEVIN: I was just going to point out that we have a

7  civil settlement agreement with them that was submitted to the Court.

8  THE COURT: You don't have the address handy. If we

9  can't find it in our papers, we'll find it.

10  MR. GENSER: We'll provide it,

11  your Honor.

12  MR. LEVIN: Very good, your Honor.

13  The other point is --

14  THE COURT: That's $150,000?

15  MR. LEVIN: 250.

16  MR. GENSER: 250.

17  THE COURT: 250. And so you have the monies and

18  you're going to be able to forthwith deliver them to the other attorneys

19  in trust.

20  MR. LEVIN: Thursday morning they will leave my office.

21  I just have to be in Manhattan tomorrow and I don't --

22  THE COURT: All right.

23  MR. LEVIN: Thursday morning.

24  THE COURT: So you're making a representation as an

25  officer of the Court that these funds are in your escrow account. Very

---

**Proceedings** 67

1  good.

2  MR. GENSER: And, your Honor, just to complete the

3  restitution picture, MYLA has submitted a claim for restitution in the

4  amount of -- Mr. --

5  MR. LEVIN: $504,000.

6  MR. GENSER: -- for $504,000.

7  Mr. Vincent Nasso has already executed a release of claims against

8  monies owed to him from MYLA which plus the $250,000 will achieve

9  that amount, so that your Honor can order mandatory restitution in the

10  full amount understanding that that part has already been satisfied.

11  THE COURT: So, the full amount would be once again?

12  MR. GENSER: $500 and --

13  THE COURT: I guess the judgment should --

14  MR. LEVIN: Well, wait a minute.

15  THE COURT: Just one second. There's a problem.

16  (Pause in proceedings)

17  (Discussion held off the record)

18  THE COURT: It could be simpler if we agree upon the

19  restitution --

20  MR. GENSER: Yes.

21  THE COURT: -- that's due and owing now to be in the

22  sum of $250,000. That would really make the judgment very clean and

23  crisp and clear.

24  MR. LEVIN: We can do that.

25  THE COURT: You can do that.

---

**Proceedings** 68

1  MR. GENSER: Okay.

2  THE COURT: That's consistent with your plea agreement.

3  MR. GENSER: Yes, your Honor.

4  MR. LEVIN: Your Honor, we also agree in light of the

5  $504,000 figure and the government's figure, we agree that 24 months

6  is the right sentence. Where that leaves us in the realm of the

7  guidelines is probably in the same place.

8  THE COURT: So why don't we do this then? This sounds

9  like a no brainer to me compared to the prior proceeding where I felt I

10  was not comfortable with the disparity between the guidelines and the

11  agreed upon plea. Here there will apparently be no disparity.

12  So, why don't we simply go through the guidelines

13  calculation and since you are in agreement essentially about it and then

14  we can proceed in a nice orderly fashion.

15  I take it your client is prepared to be sentenced today, Mr.

16  Levin?

17  MR. LEVIN: Yes, your Honor.

18  THE COURT: And you've given him the presentence

19  agreement and he understands everything that's contained in it.

20  MR. LEVIN: That's correct,

21  your Honor.

22  THE COURT: I should say the presentence report.

23  MR. LEVIN: Right.

24  THE COURT: And the plea agreement and everything else

25  that goes along with this. I should first address the plea.

69

1         MR. LEVIN: Well, your Honor, might --

2         THE COURT: Mike, do you have the other file? You

3 have that handy reference to it and I can just tab.

4         Were you going to say something,

5 Mr. Levin?

6         MR. LEVIN: Your Honor, Mr. Genser and I agree that

7 there's a typographical error in page 1 of the plea agreement where it

8 says maximum term of imprisonment 20 years.

9         THE COURT: You're going too fast.

10         MR. LEVIN: I'm sorry, Judge. Maximum term of

11 imprisonment in the plea agreement states 20 years. The government

12 and I agree that that's a typographical error but 18 USC 1343 states it's

13 five years from the date of the offense.

14         THE COURT: Now, let me find your client's plea

15 agreement. 1343 is five years and not 20 years; right?

16         MR. GENSER: It's been amended to be 20 years but I

17 think the applicable range for Mr. Vincent Nasso would be five years

18 which is what it previously was.

19         THE COURT: All right. So, then we agree that the plea

20 agreement will be amended on page -- the first page in paragraph 1(a)

21 to read five years for the maximum term of imprisonment and not 20

22 years; correct?

23         MR. GENSER: Correct.

24         THE COURT: Everyone is in agreement.

25         Any other adjustments that need be attended to in the plea

Transcription Plus II    Rosalie Lombardi

---

70

1 agreement?

2         MR. GENSER: No, your Honor.

3         MR. GENSER: Well, I am just --

4         MR. GENSER: We've already addressed the restitution.

5         MR. LEVIN: Your Honor, yes, other than the fact that

6 we're converting the fine to restitution.

7         THE COURT: All right. So paragraph 2 will now be

8 amended by agreement of the parties to provide that the sum of

9 $250,000 would be considered restitution and that there will be no

10 fine.

11         MR. GENSER: Yes, your Honor.

12         MR. LEVIN: Yes, your Honor.

13         THE COURT: All right. So, it's understood that

14 paragraph 2 should be deemed accordingly. And otherwise, everything

15 stays in place.

16         MR. GENSER: Yes, your Honor.

17         MR. LEVIN: Yes, your Honor.

18         THE COURT: All right.

19         I guess we should also indicate now that you have agreed

20 to pay the $250,000 forthwith and that would be deemed to be in

21 compliance and an amendment to paragraph 3 which provides that --

22         MR. LEVIN: Your Honor is correct.

23         THE COURT: -- the defendant agrees to pay 150 of the

24 fine that applied to sentencing and shall pay the remaining $100,000

25 during the period of supervised release. So, that language will also be

Transcription Plus II    Rosalie Lombardi

---

Proceedings    71

1 deemed amended to accommodate what has been agreed upon by the

2 parties in terms of restitution and the payment of it.

3         Now, there's nothing in the plea agreement that talks

4 about the supervised release scenario. So, the Court is free to make

5 whatever determinations it deems appropriate --

6         MR. LEVIN: Correct, your Honor.

7         THE COURT: -- under the law in respect to that; correct?

8         MR. LEVIN: Correct.

9         MR. GENSER: Correct.

10         THE COURT: And also there's nothing in here that

11 speaks to any special conditions that the Court may be --

12         MR. LEVIN: Correct.

13         THE COURT: -- deem appropriate to accommodate the

14 supervised release.

15         MR. LEVIN: That is also correct,

16 your Honor.

17         THE COURT: All right. So, we've dealt with the plea

18 agreement.

19         Now let's look next at the allocution before Magistrate

20 Judge Pohorelsky in respect to Vincent Nasso. And I reviewed the

21 minutes of the proceedings before the good magistrate judge which

22 took place on August 13, 2003.

23         The plea agreement, I assume was entered into on or about

24 that date though my copy is undated; correct, Mr. Genser?

25         MR. LEVIN: It was the same day.

Transcription Plus II    Rosalie Lombardi

---

Proceedings    72

1         MR. GENSER: August 13, 2003,

2 your Honor.

3         THE COURT: Okay.

4         And at page 53 of the minutes, Vincent Nasso allocuted as

5 follows. "On and between February 1998 and June 2002, I engaged in a

6 scheme to defraud MYLA by failing to disclose my relationships with

7 individuals barred from the ILA who were engaged in making improper

8 influence to MYLA trustees in order to help me obtain and maintain my

9 company's contract with MYLA. I understand that interstate telephone

10 calls were made on my behalf."

11         That's the sum and substance of his allocution and I find

12 that that satisfies the law in terms of the fact that he has pled guilty to

13 the crime which he has pleaded to. So, I'll accept the recommendation

14 and the plea is accordingly accepted.

15         Now, as far as the plea agreement is concerned, I've

16 already indicated that I will agree to the 24 month imprisonment. It's

17 sort of like putting the cart before the horse because technically, I

18 guess, I shall allow the defendant to speak before sentence is officially

19 imposed. But we all understand what we're talking about here.

20         Let's make our guideline calculation and since we have

21 significant agreements here now, we can spread to that, I take it, with

22 due dispatch and turn to page 58 of the presentence report. The

23 computation is as follows.

24         The base offense level is 6, as the specific offense

25 characteristic in nature in respect to the amount of the estimated loss

Transcription Plus II    Rosalie Lombardi

## Page 74 (left top)

of $3,779,541, an additional 13 levels are added since the loss is greater than $2.5 million. That's part of your agreement.

MR. LEVIN: Well, your Honor, if I may? We have an agreement but the agreement is as follows and Mr. Genser will correct me if I misstate this. It's the government's position that the loss was in excess of $2.5 million. It's the defense's position that the loss is $504,000. Either way, we are at 24 months under the guidelines.

THE COURT: Well, all right.

MR. LEVIN: Using, of course, the 1998 --

THE COURT: But I am going to try to make the calculation now. The basis for $2.5 is set forth in the plea agreement. I'm going to enforce the plea agreement in all respects. You're not suggesting that it's not viable. You're not trying to walk away from it at all.

MR. LEVIN: No, we're not.

THE COURT: So, it's greater than $2.5 million. That's a 13 level enhancement. And there's an additional two level specific offense characteristic because the acts involved repeated acts over a period of time. You don't take any exception to that.

So, the adjusted offense level is 21 with three levels off for acceptance of responsibility. Under the guideline, the total offense level would be 18 and that would carry a range of imprisonment since Mr. Nasso's in criminal history category of --

MR. LEVIN: One.

## Page 74 (right top)

THE COURT: -- one of from 27 to 33 months; correct?

MR. LEVIN: That is correct, your Honor.

MR. GENSER: And then there is the additional level for the global point.

THE COURT: Now, yes, and that's been consistently applied. So, that would bring you down to 24 to 30 months. And the proposed 11(e)(1)(C) disposition which you want the Court to accept is exactly 24 months.

MR. LEVIN: Correct.

THE COURT: So here, since we're within the guideline range, essentially, I don't really have to reach out for any reasons even if that was required under the law.

MR. LEVIN: Correct.

THE COURT: And, you know, certainly there's no basis for me not to accept the 11(e)(1)(C) 24 month plea.

MR. LEVIN: Correct.

THE COURT: Now, anything else you wish to say on behalf of the issue of supervised release or anything else that you wish to address --

MR. LEVIN: Your Honor, I would --

THE COURT: -- to the Court before sentence is officially imposed?

MR. LEVIN: Yes, your Honor. With regard to the issue of supervised release, it's my understanding of the statute that

## Page 75 (left bottom)

Proceedings    75

Mr. Nasso can get up to two years.

THE COURT: Up to two years?

MR. LEVIN: Up to two years is my understanding.

THE COURT: Up to two or three?

MR. LEVIN: No, this is -- an extortion carry is a greater felony under the United States code. It's my understanding that a mail fraud count carries up to two years. That's a lower grade felony.

THE COURT: You may be right.

MR. GENSER: Judge, I actually think he is right and we would probably have to make a note of that on the plea agreement that it's two years with one year imprisonment for a violation.

THE COURT: The --

MR. LEVIN: I think.

THE COURT: For some reason, the PSR states in paragraph 297 that supervised release of not more than three years may be imposed under 18 USC 3583(a) and (b)(2).

MR. GENSER: I actually think -- I'm sorry, Judge, I think the probation report is correct.

THE COURT: The guideline provision is two but not more than three years. Yes, I'm sorry.

MR. GENSER: I think that's correct.

MR. LEVIN: I think it's zero to two.

THE COURT: Go ahead.

MR. LEVIN: Your Honor, I am going to make my pitch to the Court in regard to whether Mr. Nasso should even have supervised

## Page 76 (right bottom)

Proceedings    76

release.

As your Honor is well aware, Mr. Nasso has no prior involvement with the criminal justice system. The man standing before you is a 45 year old man, father of three children, who has lived his whole life lawfully. This is also a very unfortunate incident. Like his brother, he has become entailed in something that I don't believe you'll ever see him before this court or any other court again.

Mr. Nasso is also receiving a substantial sentence. He's going to be in jail for at least 18 months and three weeks. I would ask that your Honor consider --

THE COURT: 18 months and three weeks; that assumes he is going to get credit for good behavior.

MR. LEVIN: Assuming there are no incidents in jail. I would ask that the Court consider not issuing any supervised release in this situation. We would consent to all other conditions, disassociation from anybody that is alleged to be involved in organized crime, anything else your Honor feels is appropriate. But this is the type of situation where it may not be necessary.

THE COURT: Well, make your pitch but I think some supervision is indicated here.

What do you wish to say, if anything, Mr. Genser, about this?

MR. GENSER: Judge, I think some supervision is indicated, as well.

THE COURT: Anything else you wish to say before I

## Page 78 (left top)

Proceedings 78

1 speak to Mr. Nasso?

2 MR. GENSER: No.

3 THE COURT: Mr. Levin, anything else from you?

4 MR. LEVIN: No, your Honor.

5 THE COURT: Mr. Nasso, you know, you know, as well as

6 I do exactly what your criminal activity is. I heard many, many tapes

7 where you were involved, I think, directly if I recall on a number of

8 these tapes. And certainly, you were very much involved with the

9 MYLA scenario which has served as the basis for your

10 acknowledgement of your criminal culpability. So, I know all of that

11 because I spent a lot of time listening to tapes.

12 Perhaps unlike your brother, who was somewhat more

13 peripherally involved in sort of an isolated scenario being caught up

14 with this craziness with the Segall situation, you were involved in a

15 repeated way, in a profound way, involving lots of money and your

16 crime is going to be punished more so than Jules and appropriately so.

17 I don't condone it but I do think that the 24 month

18 agreement squares with what you would be sentenced to under the

19 guidelines and in the absence of such an agreement if you were

20 convicted of the crime for which you pled, that's why I will accept

21 that.

22 So, this is your opportunity to speak to me, if you wish to

23 say anything before sentence is formally imposed.

24 MR. LEVIN: Your Honor, may I say something about

25 this?

Transcription Plus II    Rosalie Lombardi

## Page 79 (top right)

Proceedings 79

1 THE COURT: Yes.

2 MR. LEVIN: I just want the Court to be aware of some

3 things. I am going to be very brief. As I've already said this is a 45

4 year old man whose family is in the audience. He has three children.

5 He's a caring, loving father. He is a caring member of his community.

6 As your Honor is aware, we submitted to this court in

7 excess of 40 letters. Letters from cardinals, letters from fire

8 battalions, captains in the police department, letters from school

9 teachers, letters from people whose lives were saved by Mr. Nasso.

10 There are two particular situations before this court where women

11 could not afford medication, one for herself, she was going blind and

12 one for her children. In both situations, Mr. Nasso brought them the

13 medicine at no charge and continued to make sure they had the

14 necessary medications they needed, so that in one case the children

15 would be all right and in the next case, the women would get the eye

16 medication she needed.

17 In another case, he saved somebody's life while everybody

18 stood by. This is not your typical defendant and I'm not saying that

19 because I'm asking for a downward departure. I'm saying that because

20 this is somebody that has basically spent his life trying to do right.

21 This is and I do not say it in the legal, technical term, but I say it in

22 the common dictionary term, an aberrational act. And I want the Court

23 to be aware of that when the Court issues its sentence.

24 THE COURT: I don't see where it's so aberrational

25 because of the planning that went into this, because of the numerous

Transcription Plus II    Rosalie Lombardi

## Page 79 (bottom left)

Proceedings 79

1 meetings, because of the amount of money involved, the self-dealing.

2 It's not unusual. I see it many times where criminals sort of live a

3 dichotomous or bifurcated life. They're very moral when it comes to

4 serving their community and they're very immoral when it comes to

5 feathering their own economic nest. I see it all of the time. I think

6 Mr. Nasso falls somewhat into that dichotomous category.

7 In any event, Mr. Nasso, you could speak to me before

8 sentence is imposed.

9 DEFENDANT V. NASSO: Your Honor, I would like to

10 apologize to the Court, to my wife and family, to everyone that is here

11 today and even to MYLA itself. If I have done anything that I haven't

12 apologized for, I am apologizing, and I'm going to accept everything

13 that is coming to me before you.

14 THE COURT: As indicated, the Court will accept the

15 negotiated plea agreement pursuant to 11(e)(1)(C) of the code of

16 criminal law and I sentence you to 24 months of imprisonment. I'm

17 going to impose two years of supervised release. I think that that's

18 appropriate in light of the fact that you've had some sustained history

19 here of contact with some bad people. And as a special condition of

20 that supervised release, you will not associate in person, through mail,

21 electronic mail or telephone with any individual with an affiliation to

22 any organized crime groups, gangs or any other criminal enterprise,

23 nor shall you frequent any establishment or other locale where these

24 groups may meet pursuant but not limited to a prohibition list provided

25 by the probation department.

Transcription Plus II    Rosalie ...di

## Page 80 (bottom right)

Proceedings 80

1 This may be a little bit more of a profound special

2 condition than a similar condition which I imposed upon your brother

3 because you've had many relationships with people who have been on

4 the wrong side of the law. And this may be something which may be

5 more challenging for you to comply with. But I warn you that if I get

6 any violation here because you're carrying on with your old gang again,

7 you're going to be subject to serious punishment. Just be mindful of

8 that.

9 A $100 special assessment. You already mentioned that

10 the restitution is agreed to be $250,000. We understand that if there's

11 any other sums that were implicated, they've been satisfied and

12 everybody agrees that the residual restitution now that we're speaking

13 about is $250,000. It's going to be paid forthwith, as represented by

14 distinguished counsel, Mr. Levin. And there's no need to provide for

15 any interest.

16 We've already had made arrangements for how the monies

17 will be transferred to MYLA's attorneys and to be held in trust and to

18 be distributed in turn to the appropriate recipients of those funds.

19 There is no fine, since we're providing for restitution.

20 There are general conditions of supervised release which the clerk of

21 the court is handing to you now. Read them carefully. Make sure you

22 comply with all of them. The sentence I've imposed is appropriate

23 under the law and I want to also advise you that even though you've

24 waived your appellate rights in many significant ways, you still have a

25 window of opportunity if you believe that a constitutional right of

Transcription Plus II    Rosalie Lombardi

**Page 81**

1  yours has been violated, something very basic and fundamental in
2  which you believe that to be the case, you can perfect your right to
3  appeal, such as it may be by filing a notice of appeal within ten days
4  after the entry of written judgment. And it will have to be perfected
5  thereafter. Your skilled attorney knows how to counsel you in that
6  respect.

7           The restitution is a stand alone restitution order. There's
8  no joint and several liability here. I'm not aware of any. I think it's
9  all his responsibility; correct?

10          MR. LEVIN: The 250 will be
11  Mr. Nasso's responsibility.

12          THE COURT: Sole responsibility. I mentioned a special
13  assessment of $100 is due and owing.

14          As far as the other counts in the indictment --

15          MR. GENSER: We move to dismiss them, your Honor.

16          THE COURT: -- are you concerned about whether or not
17  the global plea agreement -- I think he's the last one with the exception
18  of one other person?

19          MR. GENSER: I think that's correct,
20  your Honor. We're going to move to dismiss the remaining counts in
21  the underlying --

22          THE COURT: All right. We run the risk of whatever may
23  happen with the other person.

24          MR. GENSER: As to both Mr. Nasso and his brother,
25  Julius Nasso.

Transcription Plus II    Rosalie Lombardi

**Page 82**

1           THE COURT: Okay, so that's granted.

2           Anything else, Mr. Levin?

3           MR. LEVIN: Your Honor, yes, three ministerial points.
4  One of which is I would ask that your Honor also recommend the camp
5  and preferably FPC Schuylkill and I'll tell the Court why. As you
6  know, your Honor,
7  Mr. Nasso has a medical degree and he's a pharmacist. FPC Schuylkill
8  in Pennsylvania has an affiliation with the Veterans Hospital out there
9  and if Mr. Nasso qualifies, he's allowed after six months to work in the
10 Veterans Hospital helping disabled veterans and then return to the
11 prison in the evening.
12 We are asking if your Honor consider that and make that
13 recommendation.

14          THE COURT: I'll recommend this that if in the discretion
15 of the Bureau of Prison and in the judgment of the Bureau of Prison it
16 can find a place to take advantage of his particular skills and
17 expertise in the pharmaceutical business, that the Court's
18 recommendation it should make that effort. I'm not going to otherwise
19 tell the BOP where to sentence him. I think a minimal security is
20 appropriate under these circumstances, as well. So, the
21 recommendation would be of that direction but the BOP will make the
22 final determination.

23          MR. LEVIN: Two more to go, Judge. One is I would ask
24 for if it's all right with the government, I heard your Honor say six
25 weeks, we're asking for eight weeks so

Transcription Plus II    Rosalie Lombardi

**Proceedings**    83

1  Mr. Nasso can get his affairs in order.

2           THE COURT: I suspect the government is not opposing
3  that.

4           MR. GENSER: We don't have an objection to that.

5           THE COURT: All right. So, let's pick a date for self-
6  surrender after designation. The clerk will give us a date.

7           THE CLERK: How is April 16, Friday, April 16.

8           THE COURT: April 16, Friday, April 16. I think that
9  concludes the proceeding.

10          MR. LEVIN: Direct to the facility; yes.

11          THE COURT: Yes, you will presumably be designated by
12 that time.

13          MR. LEVIN: Right, if you're not designated, it's going to
14 be later.

15          THE COURT: If you haven't been designated, I'm
16 charitable in giving you some extension of time --

17          MR. LEVIN: I understand, Judge.

18          THE COURT: -- because I want to accommodate self-
19 surrender but I assume that by that date they would be a designation.

20          MR. LEVIN: Your Honor, the last ministerial request is
21 when this case started when Mr. Nasso was arrested, the government's
22 civil division of the eastern district issued lis pendens on his real
23 estate, his property. That's in addition to the securities bail. We
24 would ask that the be vacated upon his payment of the $250,000. This
25 way, I can get my property freed up. I am sure the government is --

Transcription Plus II    Rosalie    rdi

**84**

1           THE COURT: I know nothing about it. I haven't reflected
2  upon this. I mean, I don't know whether --

3           MR. GENSER: I don't think this is a matter for the Court.
4  I think we can work this out.

5           THE COURT: Why don't you see whether you could agree
6  with the government on that, so that the Court doesn't have to be
7  placed in motion in terms of sorting all of that out. If there is some
8  problem, there are ways of making proper application to the Court.

9           MR. LEVIN: All right.

10          MR. GENSER: Thank you, your Honor.

11          THE COURT: That completes the sentence today.

12          MR. LEVIN: Your Honor, thank you for your courtesy.

13          DEFENDANT V. NASSO: Thank you.

14          MR. GENSER: Thank you.

15          (Matter concluded)

16                  -oOo-

17
18
19
20
21
22

C E R T I F I C A T E

Transcription Plus II    Rosalie Lombardi

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this 19th day of February , 2004.

--------------------------
Rosalie Lombardi
Transcription Plus II

Transcription Plus II       Rosalie Lombardi

# EXHIBIT C

### REQUEST FOR ADMINISTRATIVE REMEDY
### INFORMAL RESOLUTION FORM
### FCI, ELKTON, OHIO

--------------------------------------------------------------------------------

Bureau of Prisons Program Statement 1330.13 "Administrative Remedy Procedures for Inmates", states that "before an inmate seeks formal review of a complaint he must try to resolve the complaint informally by presenting it to a staff member." The staff member must also try to resolve the complaint "informally" before the inmate will be given an Administrative Remedy Form.

INFORMAL RESOLUTION NUMBER: _DB001_

INMATE'S NAME: _Julius Nasso_____ NO. _67293-053_ UNIT _D-B_

1. Specific Complaint: _CIMS assignment is inaccurate pursuant to J & C, and letter of Mr. Caroppolo of U.S. Probation Dept. E.D. N.Y. BOP Is Using and Maintaining inaccurate records to my prejudice._

2. Relief Requested: _Immediate correction of Records & removal of CIM designation. Corrections directed also by law because PSR was not adopted by District Court at sentencing. Only 4 paragraphs of PSR pertain to me. See also 5 USC § 552a(d)(2)(A)(B)(i)(ii) requires correction within ten days. Please expedite per 28 CFR 40.8._

3. Date/Time Complaint received from inmate: _11-05-2004  9:00 AM_

4. Date/Time Informally discussed with inmate: _11/4/04 @ 4:32_

5. Staff Response: _The Region is the review authority on the Special Supervision CIM assignment._

6. Date Administrative Remedy provided: _____

7. Informal Resolution was / was not accomplished.

_[signature]_ Julius R. Nasso          _11-4-04_
nmate's Signature/Register No.              Date

_[signature]_ Case Manager          _11/4/04_
STAFF MEMBER'S NAME & TITLE              Date

_____          _____
JNIT MANAGER'S SIGNATURE              Date
The Unit Manager, by signing above, certifies that good faith efforts were attempted to resolve this inmate's complaint.

DISTRIBUTION: If complaint is informally resolved before being receipted, Correctional Counselors shall maintain informal resolution form for future reference. If complaint is not informally resolved, forward original resolution form, attached to administrative remedy, to the Administrative Remedy Clerk.

## CONSOLIDATED EXHIBIT "C"

Federal Bureau of Prisons

Case 1:05-cv-01015-FB   Document 1   Filed 02/24/05   Page 52 of 60 PageID #: 54

*Type or use ball-point pen. attachments are needed, submit four copies. Add al instructions on reverse.*

**From:** NASSO Tullus R    67923-053   Delta Bravo   FCI ELKTON
LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A- INMATE REQUEST** I have been Classified as a CIMS inmate with a Special supervision assignment based upon inaccurate information in my BP-15 and false allegations of my being associated with Organized Crime: 1) My JNC states that I am not linked to Organized Crime; 2) In my Sentencing Transcripts The Judge specifically stated that I am not an associate of Organized Crime; 3) My Judge further stated that the PSR was not being adopted in my Case. This is the Same PSR being used by the "BOP" to Misclassify me and maintain these inaccurate Records. 4) A letter sent to the "BOP" by one Tony Garcppolo (chief Probation officer for The Eastern District of New York) specifically states that I am not Organized Crime, nor am I an associate of Same. **CONCLUSION:** I am requesting That the inaccurate CIMS & SPECIAL SUPERVISION ASSIGNMENTS Be removed from my BP-15 and anywhere else, in my file(s), that this misclassification my exist.

Nov. 4, 2004.
DATE

SIGNATURE OF REQUESTER

**Part B- RESPONSE**

DATE

WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE      CASE NUMBER: _____

CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

DATE                    RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

USP LVN          Printed on Recycled Paper

## REQUEST FOR ADMINISTRATIVE REMEDY
## PART B RESPONSE

**Nasso, Julius R.**
**Reg. No.: 67923-053**
**Remedy I.D.: 358188-F2**
**Unit D/B**

This is in response to your Request for Administrative Remedy receipted November 17, 2004, in which you request the removal of the Central Inmate Monitoring assignment of "Special Supervision."

Investigation into the matter indicates you have been classified as a Special Supervision case due to the fact you were recognized as an associate of an organized crime family. On October 18, 2004, the Northeast Regional Office determined there was adequate information to support the classification of Special Supervision. The Central Inmate Monitoring assignment of Special Supervision does not preclude you from transfer, temporary release, or participation in community activities recommended by the Warden.

Based on these findings, your Request for Administrative Remedy is denied.

If you are not satisfied with this response, you may appeal to the Regional Director, Bureau of Prisons, Northeast Region, U.S. Custom House, 7th Floor, 2nd and Chestnut Streets, Philadelphia, Pennsylvania 19106, within 20 calendar days of the date of this response.

_____          __12/2/04_____
T. R. Sniezek, Warden                               Date

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

From: __NASSO Julius R.__     __67923-053__   __D/B__   __FCI Elkton__
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A—REASON FOR APPEAL** I have been incorrectly classified as a CIMS inmate with a special supervision assignment based upon inaccurate information. in my BP-15 and false allegations of my being associated with organized crime. I am not associated with organized crime. My JNC states that I am not linked to organized crime. In my sentencing transcript, the Hon. Frederick Block stated that I am not an associate of organized crime. The Hon. Block also stated the PSR was not being accepted in my case. It is this same PS that is being used by the BOP to misclassify me and to continue to maintain these inaccurate Records. There is, however, a letter from the chief Probation Officer in the Eastern District of New York, Tony Garoppolo, that states I am not a member of or associated with organized crime. I respectfully request that the CIMS special supervision classification be removed from my BP-15 + everywhere else in my file.

__12/28/04__          __Julius M. Nasso__
     DATE               SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_358/88-R1_

_____          REGIONAL DIRECTOR
     DATE

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE          CASE NUMBER: _____

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

USP LVN   DATE   Previous editions not usable   SIGNATURE, RECIPIENT OF REGIONAL APPEAL   BP-230(13) APRIL 1982

REQUEST FOR ADMINISTRATIVE REMEDY
INFORMAL RESOLUTION FORM
FCI, ELKTON, OHIO

----------------------------------------------------------------------

Bureau of Prisons Program Statement 1330.13 "Administrative Remedy Procedures for Inmates",
states that "before an inmate seeks formal review of a complaint he must try to resolve the complaint
informally by presenting it to a staff member." The staff member must also try to resolve the
complaint "informally" before the inmate will be given an Administrative Remedy Form.

INFORMAL RESOLUTION NUMBER: __DB 007__

INMATE'S NAME: Julius Nasso        NO. 67923-053  UNIT  DB

1. Specific Complaint: Greatest severity score is inappropriate and inaccurate pursuant to J & C, as there
is only a conspiracy Charge, PSR was not adopted by Court.  U.S.P.O. E.D. NY has directed Correction PSR.

2. Relief Requested: Immediate Correction of Records pursuant to 5 USC § 552a(d)2)(A)(B)(i)(ii)²and removal of
Reference to "CC" because it is not reflected in the J & C and Per P.O. Mr. Garoppolo's of E.D. of New York who
directed BOP to Correct PSR.  Law requires correction within ten days¹ Should be changed to lowest severity.

3. Date/Time Complaint received from inmate: _11-4-04  9:00 Am_

4. Date/Time Informally discussed with inmate: _11-5-04  8:00 Am_

5. Staff Response: _Your Custody Classification Form will be completed_
_seven months after their arrival at this facility. All pertinent_
_info' provdin will be taken into consideration_

6. Date Administrative Remedy provided: _____

7. Informal Resolution was / was not accomplished.

_Julius N. Nasso_                        _11-4-04_
ınmate's Signature/Register No.          Date

_[signature]_                            _11/4/04_
STAFF MEMBER'S NAME & TITLE              Date

_____                   _____
ʋNIT MANAGER'S SIGNATURE                 Date

ʕhe Unit Manager, by signing above, certifies that good faith efforts were attempted to resolve this
ınmate's complaint.

ʋISTRIBUTION: If complaint is informally resolved before being receipted, Correctional Counselors
ʃhall maintain informal resolution form for future reference. If complaint is not informally resolved,
ɔrward original resolution form, attached to administrative remedy, to the Administrative Remedy
ɔlerk.

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: __NASSO    JULIUS   A__   __67923-053__   __Delta Bravo__   __FCI ELKTON__
      LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

Part A– INMATE REQUEST   I am requesting that my BP-15 be corrected to reflect A Lower or Lowest Severity, and that my Security Score be changed to reflect the same. In support of this request, I bring the following facts to your attention: 1) The PSR, which is being used by the "BOP" to Maintain These inaccurate records, was NOT ADOPTED by the Judge, in my Case; 2) A letter, received by the "BOP", from one Tony Garoppolo, Chief Probation officer for the eastern district of New York, states that my record is inaccurate and need to be Corrected; 3) My JNC does not support the finding of Greatest Severity; 4) My Judge specifically stated that I am not an associate of Organized Crime. This Misconception is being used by The "BOP" To score me as Greatest Severity. CONCLUSION: I am requesting that my BP-15 be Corrected to reflect the fact that I am not a Greatest Severity offender, and more properly should be scored as a LOWEST SEVERITY.

__Nov. 4, 2004.__                                  _____
DATE                                         SIGNATURE OF REQUESTER

Part B– RESPONSE

 

_____                               _____
    DATE                                  WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE            CASE NUMBER: _____

                                            CASE NUMBER: _____

Part C– RECEIPT
Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION
SUBJECT: _____

_____                               _____
    DATE                                RECIPIENT'S SIGNATURE (STAFF MEMBER)

USP LVN         Printed on Recycled Paper                           BP-229(13)
                                                          APRIL 1982

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: DECEMBER 14, 2004

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      NORTHEAST REGIONAL OFFICE

TO  : JULIUS R NASSO, 67923-053
      ELKTON FCI      UNT: UNIT D     QTR: Z05-209LAD
      P.O. BOX 89
      ELKTON,  OH 44415


FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID       : 358188-R1       REGIONAL APPEAL
DATE RECEIVED   : DECEMBER 9, 2004
SUBJECT 1       : CENTRAL INMATE MONITORING - EXCEPT SEPARATION
SUBJECT 2       :
INCIDENT RPT NO:

REJECT REASON 1: YOU DID NOT SUBMIT A COMPLETE SET (4 CARBONIZED
                 SHEETS) OF THE REQUEST (BP-9) OR APPEAL
                 (BP-10) OR BP-11) FORM.   (CIRCLE ONE)

REJECT REASON 2: SEE REMARKS.

REMARKS         : DO NOT WRITE IN PART B-RESPONSE SECTION OF
                  BP-10 FORM.

U.S. Department of Justice

Federal Bureau of Prisons

Regional Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP–DIR–9 including any attachments must be submitted with this appeal.

From: NASSO   Julius R.   67923-053   D/B   EIKTON
LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A—REASON FOR APPEAL** I am Requesting that my B/P-1S be corrected to reflect a Lower or Lowest Severity and that my severity score be changed to reflect the same. ① THE PSR, which is being used by the "BOP" to maintain these inaccurate records was NOT ADOPTED by the Judge, in my case. ② A letter recieved by the "BOP" from DNK Mr. Tony Garoppolo, chief probation officer for the Eastern DIST of N.Y. State that my record is inaccurate and need to be corrected. ③ My PSC does not support the finding of GREATEST Severity. ④ The Judge specifically stated that I am not an associate of organized Crim. The misconception is being used by the "BOP" to score me as Greatest Severity. Conclusion I am, Requesting that my BP-1S be corrected to reflect the FACT that I am NOT Greatest Severity offense and my score should be LOWEST SEVERITY

DATE 12/1/04                    SIGNATURE OF REQUESTER   Julius Nasso

**Part B—RESPONSE**

**NASSO, Julius**
Reg. No. 67923-053
Appeal No. 358187-R1
Page One

---

### Part B - Response

You appeal the decision of the Warden at FCI Elkton in denying
your request to change your severity scoring from greatest to
lowest severity.  You state the Pre-Sentence Investigation Report
(PSR), which is being used by the Bureau of Prisons is inaccurate
and was not adopted by the judge in your case.  You further state
the Chief Probation Officer from the Eastern District of New York
informed the BOP in a letter that your records were inaccurate.
You contend your Judgement and Commitment Order does not support
the finding of greatest severity and the judge indicated you are
not an associate of organized crime.  As relief, you request your
custody classification form be changed to lowest severity.

Program Statement 5100.07, <u>Security Designation and Custody</u>
<u>Classification Manual</u>, indicates the severity of the current
offense is based upon the most severe documented instant offense
behavior.  According to your Presentence Investigation Report
(PSR), your offense behavior indicated you were involved in a
Conspiracy to Commit Extortion.  You recruited an organized crime
associate to assist you in extorting an individual.  As a
conspirator, you are being held accountable for the acts of your
co-conspirators.  Extortion, which is the most severe documented
offense behavior, is considered according to the Security
Designation and Custody Classification Manual, Appendix B, to be
of greatest severity.

Records indicate you are not being scored based on your
association with organized crime members but rather your offense
behavior.  Specifically, you told the individual "if he had said
one word, he would have been killed."  Your contention that the
USPO's letter supports your claim of an inaccurate scoring is
without merit.  The letter does not state that the information
concerning your offense behavior or your custody classification
scoring is either inaccurate or needs correction.  Based on the
above information, your BP-15 is appropriately scored as greatest
severity.  Accordingly, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the
General Counsel, Federal Bureau of Prisons.  Your appeal must be
received in the Administrative Remedy Section, Office of General
Counsel, Federal Bureau of Prisons, 320 First Street, N.W.,
Washington, D.C. 20534, within 30 calendar days of the date of
this response.

Date: January 5, 2005

D. SCOTT DODRILL
Regional Director

U.S. Department of Justice                                    **Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attach-
ments must be submitted with this appeal.

From: _NASSO   Julius R._____  _61923-053_____  _D/B_____  _Elkton_____
         LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A—REASON FOR APPEAL** This is appeal of prior denials of my request to have my severity
changed from greatest to ~~greatest~~ lowest severity. The BOP's basing of my classification upon
the PSR is an error, as the judge in my case rejected the PSR((EX. A) and recommended a minimum
security facility (Ex. B). Moreover, there is no evidence to support the offense behavior upon
which the BOP is basing its classification of me. There was no express threat of death.
It is only the self-interested testimony of (grand jury testimony) the alleged victim that
gives rise to any inference of a threat.   A copy of my response to the Presentencing Report is
attached as Ex. C. The BOP's scoring of me is based upon a misinterpretation of the facts in
my case. Accordingly, I request that my severity score be changed from greatest to lowest
severity.

_1/20/05_                                              _Julius R. Nasso_
      DATE                                               SIGNATURE OF REQUESTER

**Part B—RESPONSE**

---

_____                          _____
      DATE                                    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE                   CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C—RECEIPT**                           CASE NUMBER: _____

Return to: _____  _____  _____  _____
              LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

_____          ✪                _____
      DATE           Printed on Recycled Paper      SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                                              BP-231(13)
                                                     APRIL 1982