DISTRICT COURT OF THE UNITED STATES
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

|  |  |
|---|---|
| | ) No. *CV 05 1015 (FB)* |
| | ) |
| | ) MEMORANDUM IN |
| Plaintiffs. | ) SUPPORT OF MOTION |
| | ) TO EXPAND RECORD |
| vs. | ) & TO REINSTATE |
| | ) RECOGNIZANCE |
| | ) RELEASE PENDING |
| JULIUS R. NASSO | ) THE PROCEEDING |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

COMES NOW Movant, who respectfully asks this court to enter
the appropriate order that will allow expansion of the record.

Documents supporting Claimant's allegations regarding the ***clear
and present danger*** and medical negligence are in the possession of the
federal government and available to this Court upon the issuance of its
order.

Other records are available and in the possession of the United
States, or its employees regarding the intention to indict Anthony
Pellicano, and if perhaps Steven Seagal is connected to Pellicano, and
whether Seagal is to be indicted perjury and other violations of
federal law which can be reviewed in camera.

RECEIVED
APR 2 1 2005
PRO SE OFFICE

1

This information could very well constitute Brady  and Jenks Material as this witness has already "testified".

This evidence is also suggested to be habit and routine evidence which is admissible in this proceeding, under, but not limited to,  the Federal Rules of Evidence, Rules 405, & 406.

The Court has discretion to review and determine whether the records,  and prior court actions to allow discovery,  the expansion of the record, and/or to grant an evidentiary hearing.  A  party to a 28 U.S.C. $ 2255 proceeding must show good cause and obtain leave of the Court to invoke the discovery process of discovery available under Federal Rules of Criminal Procedure, the Federal Rules of Civil Procedure, or elsewhere in the usages and principles of law, such as the Jenks Act.

### *INTRODUCTION &STANDARD OF REVIEW*

Before this Court is Defendant Julius R. Nasso.  He is requesting that the Court allow discovery and/or order the production of records.

Petitioner believes that the records and evidence will show factual innocence, and material perjury by Steven Segal, and others.

Should the Court consider and grant  a hearing  on the appropriate showing, the determination is reviewed under the preponderance standard.  Please see *Hanahan v. Luther*, 688 F.2d 629 cert den. 459 U.S. 1170 (1982).

The request(s) made here is to allow this Petitioner the opportunity to show he is entitled to the benefits of the $ 2255 Motion, by and through, (but not limited to,) his claim that material perjury was used, to obtain his indictment.  Leave of the court is necessary to obtain other necessary and imperative information to enable the Court to make its just determinations  and for this Petitioner to make the requisite showing.

Applicant believes that the grant of discovery would elicit facts that are calculated to lead to discovery of admissible evidence.   The Court has the discretion to ascertain whether the claim is substantial before granting a full evidentiary hearing.   Applicant is not automatically entitled to a hearing.  The Sentencing Court had discretion to ascertain whether to grant a full evidentiary hearing.

In the case of **Ladner v. U.S**. , 358 U.S. 169 (1958) the Supreme Court ruled that whenever the sentencing  Court needs to determine factual questions an applicant who brings a motion under 28 USC $ 2255 must be given a hearing.    The question is whether, assuming the allegations of the motion to be true, the applicant is entitled to relief.

Applicant also asks the Court exercise its discretion and issue an order compelling production of documents from the Bureau of Prisons. The relevant records regarding the deaths of about 8 or more federal inmates from Elkton Ohio,  show a pattern of negligence and indicate the

3

basis of Claimant's argument regarding the *clear and present* danger  to him as a result of continued confinement at FCI Elkton, Ohio.

Upon information and belief applicant alleges in the past 18 months at least 8 FCI Elkton prisoners have died.  This petitioner suffered a stroke which was unknown and undiagnosed for 3 months by FCI medical staff.  The requested records are relevant to show and establish a pattern of medical indifference,  negligence and abuse.  (e.g., cause for the Court's  issuance of an order for the Home Confinement)

The requested records will show or demonstrate the inmates attempts to obtain timely and proper treatment.   See for example the copies of the records of Mr. Richard Messina.  Mr. Messina Recently died at FCI Elkton Ohio.  It is highly  probable the records provided regarding Mr. Messina,  will "disappear" from FCI Elkton Ohio,  to conceal the negligence by FCI Staff.   If the records do exist, they will show personal requests for treatment by this federal prisoner which will indicate the callous disregard or the allows  state of mind evidence, under Rule 404(b),  with Rules 405 & 406,  allowing the admission of habit and routine practice evidence.  These rules do not require "corroborating" evidence.

Mr. Messina's records are believed to satisfy corroboration Requirements.  As such Petitioner suggests he has met his burden of persuasion sufficient to satisfy the granting of an order for production,

4

and requests the Court find as such.

Applicant also suggests that the Court exercise its discretion and enter an order for an evidentiary hearing. An evidentiary hearing is requested to allow the Petitioner the opportunity to show he is entitled to the benefits of the correction of his Prison Records, and to show the medical indifference or negligence, in addition to the allegations that there has been a suppression and/or discovery of exculpatory information that could show actual innocence, and use of perjury.

Because of the prejudice suffered through the administrative remedy process and delayed treatment Petitioner can attend his own medical needs. This can be done by the Court's removal of this prisoner through the sentence of home confinement while the plea contract stays in tact pending the ultimate determination of this $ 2255 proceeding.

Because the Court may direct the expansion of the record to included these administrative proceedings, (Both Mr. Messina's, and Petitioner's attempts at administrative exhaustion). Said expansion may include without limitation, letters predating the filing of the motion, documents, exhibits, if so directed.

The court may require authentication of any added material. For example, "the accountant's" deposition. An abstract is attached which deposition was taken under oath. Abstracts are attached. The court is requested to issue an order to seal the same.

5

In the Return, Government counsel offered testimony where Seagal claimed "his accountants"... advised him that Nasso owed Seagal money. This is suggested to be a materially false and perjured statement. Petitioner requests leave to submit the video taped deposition of Mr. Harabedian, as an offer of proof that Seagal lied under oath on the witness stand and that the offering by the government in this matter relies upon perjured testimony which substantiates Petitioner's claims.

As further cause for granting of this request for production and expansion of the record, applicant requests that the Court consider issuance of an order for production for Court's in camera review and determinations on disclosures to Defendant of information.  Information he believes the United States has through its'  United States and its Attorneys and officers, have ( as well as other state, officials) which they may have in their possession, custody or control that shows other material perjury or other crimes by Steven Segal.

Petitioner is informed and believes information is available or is in the Government's possession that perhaps establishes or shows factual innocence.  Factual innocence is ground for granting of a $ 2255 motion, and for granting of Bail Pending this $ 2255 proceeding.

Further, cause and exceptional circumstances, are that the entire sentence will likely be served should the Court deny reinstatement of recognizance.   This proceeding is likely to take months prior to it's ruling

6

on this $ 2255 proceeding.   There is likely to be delays in obtaining the records, and documents that the Petitioner is seeking.

There is real prejudice in the likelihood of serving the entire sentence. There is a real possibility of factual innocence.  Moreover, there is the high probability that the Court, had it known, could have originally sentenced this Applicant to probation or home confinement.

The fact that Petitioner remains in custody at FCI Elkton Ohio, is established as a *clear and present* danger.  This is additional cause and prejudice that this Court may in its discretion consider.  It is suggested as meeting the as special circumstances and good cause to grant relief because there is no timely or adequate "administrative remedy". Petitioner's sentence is due to expire in July of 2005.

Petitioner has recently been notified by FCI Elkton Ohio, staff that his expected May 2005 Community Corrections  placement has been cancelled.  Apparently, Petitioner will receive no benefit of CCC placement.  He was promised and approved for CCC placement several months ago.  He now will not receive the promised CCC placement.  The facts suggest that this abridgment is believed to be a prohibited reprisal by the BOP against the Petitioner because he has exercised his right to file a 28 U.S.C. $ 2255 Motion.  His motion exposes such FCI and BOP employees to potential consequences for their official misconduct.

The FCI Ohio Staff, has nearly killed this Petitioner on at least two separate occasions. Once by unlicensed and unsupervised distribution of narcotics, (distributing the wrong king of medicine) and the other not providing timely treatment from the effects of a stroke suffered and probably triggered by the negligent and malicious distribution of the erroneous medication by FCI Elkton Ohio Staff.

Prison officials have and continue to make unlawful disclosures within the meaning of Title 5 U.S.C. $ 552a( ) ( ) et seq.,  which this Court is authorized to review for determinations on willfulness.  It can find and impose criminal sanctions.   He has alleged and complained that BOP staff have knowingly and willfully maintained inaccurate and known false records.   This claim is part of his administrative grievance against the BOP Officials.

The records sought to be produced will disclose information that is appears to have been calculated to harm and injure petitioner others

Cumulatively, these facts indicate extraordinary, or special circumstances which justify the relief requested.

Conclusion

The relief requested should be granted.

April 15, 2005

Respectfully presented,

_____

Julius R. Nasso,  No. 67923-053
FCI Elkton P.O. Box 10 DB
Lisbon, Ohio  44432

**VERIFICATION**

I, the undersigned, certify under the penalty of perjury that I have read the foregoing.  It is true and correct to the best of my knowledge, information and belief.   The attached documents and records regarding Mr. Richard Messina, true and correct copies of some of the official records and correspondence showing his attempts to obtain timely medical treatment.  Timely medical treatment he did not receive.  Additionally,  if ordered,  the records of the recently deceased prisoners is relevant to show the medical indifference and callous disregard regarding timely and proper medical treatment which was delayed causing irreparable harm.  Applicant is informed and believes that if this Court does not act on his requests at this time he also may suffer irreparable harm.

April 15, 2005

_____

Julius R. Nasso No. 67923-053
FCI Elkon P.O. box 10 DB
Lisbon, Ohio  44432

9

BP-S148.055 INMATE REQUEST TO STAFF CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) Medical Services | DATE: October 8, 2003 |
|---|---|
| FROM: Richard Messina | REGISTER NO.: 36968-054 |
| WORK ASSIGNMENT: Food Services Admin. | UNIT: FA |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

On **July 25, 2003** Dr. L. A. Woods issued a report (copy attached) recommending administration of a 2-D echocardiogram, Adenosine stress test and an MRI, with review to follow by a cardiothoracic surgeon. His recommendations were based on a CT scan performed on May 22, which scan initially had been recommended in February.

I respectfully request advice as to how the scheduling of these tests (and review thereof by a cardiothoracic surgeon) can be expedited. An assessment indicating irregularities was first made in 1999.

Thank you.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94


Printed on Recycled Paper

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS – Phone (913) 682-8700 ext. 465

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                     **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| Medical Services | October 27, 2003 |
| FROM: | REGISTER NO.: |
| Richard Messina | 36965-054 |
| WORK ASSIGNMENT: | UNIT: |
| Food Service Admin. | FA |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)
                                        submit
        I respectfully/this follow-up cop-out to my October 8 request

    (copy attached) for advice as to when the procedures (and diagnosis)

    ordered by Dr. L. A. Woods on July 25 will be administered (copy of

    Dr. Woods' report attached).

        Thank you.

                    (Do not write below this line)

DISPOSITION:

Signature Staff Member                    | Date

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS – Phone (913) 682-8700 ext. 465

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member)<br>Medical Services | DATE:<br>November 24, 2003 |
|---|---|
| FROM:<br>Richard MESSINA | REGISTER NO.:<br>36965-054 |
| WORK ASSIGNMENT:<br>Food Service Administration | UNIT:<br>FA |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

I respectfully submit this **third request** for advice as to when

I will be administered the diagnostic procedures recommended by Dr.

L. A. Woods on July 25 (**four months ago**).  Based upon his reading of

a CT scan administered on **May 22**, Dr. Woods ordered a 2-D echocardio-

gram, an Adenosine stress test and an MRI, with review to follow by

a cardiothoracic surgeon.  Mr. Nienhuis initially had ordered the CT

scan in early February (**more than nine months ago**).  The first assess-

ment of my cardiac irregularities was made in **1999** (according to Mr.

Nienhuis's reading of my records).

Thank you.

**THIRD REQUEST**

Copies of October 8 and October 27 Cop-outs Enclosed.

(Do not write below this line)

DISPOSITION:




Signature Staff Member                    Date

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS – Phone (913) 682-8700 ext. 465

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) Medical Services | DATE: December 22, 2003 |
|---|---|
| FROM: Richard MESSINA | REGISTER NO..: 36965-054 |
| WORK ASSIGNMENT: Food Service Administration | UNIT: FA |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

    I respectfully submit this **fourth request** for advice as to the pro-
gress, if any, being made on the scheduling of the diagnostic procedures
recommended by Dr. L. A. Woods based upon his reading of a CT scan admini-
stered on May 22.  I am to have a 2-D echocardiogram, an Adenosine-stress
test and an MRI, followed by review of the tests by a cardiothoracic
surgeon.

    I am enclosing copies of my October 8, October 27 and November 24
Cop-outs and a copy of Dr. Woods' July 25 Report recommending the pro-
cedures.

    Thank you.

(Do not write below this line)

DISPOSITION!

Signature Staff Member                    Date

SEHM CRITICAL CARE    716-480-2194    AUG  3  8:41 No.001 P.10

ELKTON OFFICE VISIT:         Richard Messina                    7/25/03
                       DOB 3/25/38      # 36965-054

**SUBJECTIVE:**    This is a 65 year old male who was referred for evaluation of a thoracic aortic aneurysm.  He has been known to have this since 1999.  His most recent CT scan performed on 5/22/03 shows no hilar mediastinal axillary lymphadenopathy and no _____ mass.  However, there was _____of the thoracic aorta particularly the ascending thoracic and the aortic arch dilatation, the ascending aorta measuring 5x4 cm in the maximum transfer diameter.  Currently he denies any chest pain, has no shortness of breath, PND, orthopnea.  He has no swelling of his lower extremities.

**PAST MEDICAL HISTORY:**      Significant for hypertension, hypercholesterolemia

**HABITS:**     Smokes 7 to 10 cigarettes daily for the last 40 years.

**FAMILY HISTORY:**     Non-contributory.

**MEDICATIONS:**     Simvastatin 20 mg qd; Myslodipine 40 mg qd; Hydrochlorothiazide 5 mg ½ tablet qd; Aspirin 81 mg qd.

**REVIEW OF SYSTEMS:**     This patient has no previous history of cardiovascular disease myocardial infarction, diabetes, but does have hypertension for a number of years.  He denies any angina or anginal symptoms, PND, orthopnea, palpitations.  Pulmonary - The patient denies shortness of breath, hemoptysis, TB and pneumonia.  GI – denies any melena, hematochezia, weight loss, weight gain.    Neuro – Negative for headache, blurred vision, double vision, sensory motor deficit.

**OBJECTIVE:**  Well developed, well nourished male.
   B/P:              142/81
   WEIGHT:
   HENT:            Head is normocephalic.  Jugular venous pressure is not elevated.  There are no carotid bruits noted.  Neck is supple, no thyromegaly.
   HEART:           Rhythm is regular with a Grade II/VI systolic murmur heard along the left lateral sternal border with radiation to the apex.  No diastolic murmur can be appreciated.
   LUNGS:           Clear to auscultation.
   ABDOMEN:         Soft, no mass or megaly, bowel sounds are present.
   EXTREMITIES: No clubbing, cyanosis or edema, pulses are equal and present bilaterally.
   EKG:             Shows normal sinus rhythm and is within normal limits.

**ASSESSMENT:**
1. Dilated thoracic aortic root, ascending aorta and arch 5x4 cm, whether this has been increasing in size is unknown.
2. Valvular heart disease
3. Atherosclerotic heart disease
4. Hx of hypertension

*Need MRI to determine extent of calcification of aortic arch*

*8/25/03*

Case 1:05-cv-01015-FB   Document 11   Filed 04/21/05 - Page 15 of 26

Richard Messina - # 36965-054                                              Page 2
7/25/03


PLAN:
1.  A 2-D echocardiogram, Adenosine stress test, repeat thoracic CT scan impossible, MRI
    needed, at least one of these imaging studies should be done at 6 month intervals.  Will also
    recommend review of this by a cardiothoracic surgeon.  In addition should any of the above
    tests in particular the Adenosine be abnormal then a left heart catheterization be considered.
2.  Further recommendations pending the results of these tests.


                                    _____

                                    L. A. Woods, D.O., FACC, FCCP


LAW/jad

512-111

AUTHORIZED FOR LOCAL REPRODUCTION

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

**REQUEST**

TO: UR

FROM: *(Requesting physician or activity)* Dr J. H. Woods / Burn

DATE OF REQUEST 7/25/03

REASON FOR REQUEST *(Complaints and findings)*

Possible cardiac Cath

PROVISIONAL DIAGNOSIS

Imp. Thoracic aortic Aneurysm
Valvular Heart disease , ASHD , HTN

DOCTOR'S SIGNATURE | APPROVED | PLACE OF CONSULTATION

☐ BEDSIDE  ☐ ON CALL

☐ ROUTINE  ☐ TODAY
☐ 72 HOURS  ☐ EMERGENCY

**CONSULTATION REPORT**

RECORD REVIEWED ☐ YES ☐ NO | PATIENT EXAMINED ☐ YES ☐ NO | TELEMEDICINE ☐ YES ☐ NO

8/25/03

Pending 204 per URC.

*Frances Szpytko, RHIT*
*Medical Records Administrative Specialist*

*(Continue on reverse side)*

SIGNATURE AND TITLE | DATE

HOSPITAL OR MEDICAL FACILITY | RECORDS MAINTAINED AT | DEPARTMENT/SERVICE OF PATIENT

RELATION TO SPONSOR | SPONSOR'S NAME *(Last, first, middle)* | FCI FIKton   SPONSOR'S ID NUMBER *(SSN or Other)*

PATIENT'S IDENTIFICATION *(For typed or written entries give: Name—last, first, middle; ID no. (SSN or other); Sex; Date of Birth; Rank/Grade)* | REGISTER NO. | WARD NO.

Messina, Richard
36945-054
3/25/38

**CONSULTATION SHEET**
Medical Record

STANDARD FORM 513 (REV. 4-98)
Prescribed by GSA/ICMR FPMR (41 CFR) 101-11 .203(b)(10)

UNICOR FEDERAL PRISON INDUSTRIES, INC.
LEAVENWORTH, KANSAS – Phone (913) 682-8700 ext. 465

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) PA Zeller | DATE: September 4, 2004 |
|---|---|
| FROM: Richard M. MESSINA | REGISTER NO.: 36965-054 |
| WORK ASSIGNMENT: Food Service Administration | UNIT: CA |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

I am suffering from the effects of sleep deprivation.  Each

day I return to my unit from my work assignment (Food Services

Administration) totally exhausted.  A major part of the problem

is the constantly-high noise level, worsened by the positioning

of my bunk in a three-man cube close to the bathroom.

I am not anxious to begin taking sleeping pills but I do feel

that my health is failing.

Thank you..

(Do not write below this line)

DISPOSITION:

Signature Staff Member                    Date

# HARABEDIAN DEPOSITION ABSTRACTS
## JULY 20, 2004

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| | |
|---|---|
| Pg. 9<br>L. 10-17 | Deposition taken at 3550 Wilshire Boulevard, Suite 840, Los Angeles, California.  Videographer is Jill Warren on behalf of Esquire Deposition Services located at 6222 Wilshire Boulevard, Second Floor, Los Angeles, California. |
| Pg. 9<br>L. 20-25 | People present:  Robert Hantman for Nasso, Greg Kerr on behalf of defendants, and Carmen Trutanich for Harabedian. |
| Pg. 10<br>L. 20-22<br>Pg. 11<br>L. 1-2 | States he as a bachelor's degree in accounting, a master's degree in business administration, a master's degree in taxation, and is a certified public accountant in the State of California. |
| Pg. 11<br>L. 3-5 | Asserts he has been a member of Harabedian Hall and Company since its inception since 1977. |
| Pg. 11<br>L. 6-11 | Admits to presently representing Steven Seagal and Steamroller. |
| Pg. 11<br>L. 12-16 | Denies representing Nasso, denies representing Seagal/Nasso Productions. |
| Pg. 11<br>L. 17-22 | Admits to having represented Seagal/Nasso Distribution, LLC and Seagal/Nasso Films, Inc. |
| Pg. 11, L. 23<br>Through<br>Pg. 12, L. 8 | Admits to having conversations with Nasso concerning Seagal/Nasso Productions and Steven Seagal more than ten years ago. |
| Pg. 12, L. 17<br>Through<br>Pg. 13, L. 21 | Admits to being deposed 3 or 4 times before but declines to give case names. |
| Pg. 14, L. 1-8 | Admits to providing business management services (paying Seagal's bills and advising on business matters) and income tax.  Admits to conferring with Seagal with bills that are not routine-type of bills. |
| Pg. 14<br>L. 9-24 | Admits that the file in front of him is NOT the entire file since he began to represent Seagal. |
| Pg. 15-16 | RJH & Trutanich disagree on whether Harabedian's file can be marked. |
| Pg. 18, L. 16<br>Through<br>Pg. 19, L. 9 | Admits his client, James Coburn introduced him to Seagal before "Above the Law", sometime in the 1980's. |
| Pg. 19, L. 23<br>Through<br>Pg. 20, L. 5 | Admits that Seagal introduced him to Nasso as a friend and astute businessman. |
| Pg. 20, L. 6<br>Through<br>Pg. 21, L. 2 | Admits to representing Seagal before Seagal's first movie, "Above The Law". |
| Pg. 21, L. 14<br>Through<br>Pg. 22, L. 5 | Denies being told by Seagal how Seagal met Nasso. |
| Pg. 22<br>L. 6-23 | Denies being told by Seagal that Nasso was into the movie business, denies knowing whether Nasso was ever employed by Seagal or SteamRoller Productions and denies knowing of Nasso being paid for any work done for |

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| | Seagal. |
|---|---|
| Pg. 22, L. 23 Through Pg. 23 L. 7 | Admits to representing SteamRoller Productions which is a corporation, which is an entertainment business, referred to as a loanout company. It loans out the services of Mr. Seagal. |
| Pg. 23 L. 8-22 | Denies being told by Seagal that Nasso worked with Seagal in film, "Once Upon a Time in America", denies being told by Seagal within the first ten (10) years of his representation of Seagal that Nasso was involved in organized crime. |
| Pg. 23, L. 23 Through Pg. 24,L. 10 | Denies ever suggesting to Seagal to terminate his relationship with Nasso. |
| Pg. 24, L. 11 Through Pg. 25, L. 23 | Admits knowing who Craig Emanuel is. States he knows Emanuel was Seagal's attorney, states is not certain as to whether Emanuel was Nasso's attorney. Denies being told by Emanuel of plan with Seagal to terminate relationship with Nasso. |
| Pg. 25, L. 24 Through Pg. 26, L. 24 | Admits to being business manager and accountant for Seagal since the 80's but denies having recollection as to whether Seagal lent Nasso money. Denies knowing of any check from Seagal or SteamRoller made out to Nasso that indicated there was a loan. |
| Pg. 27 L. 12-24 | Admits to knowing of monies lent by Nasso to Seagal b/c of conversations with Seagal or Nasso or monies coming into Seagal's account. Denies knowing how much money was lent but admits the records would reflect amount. |
| Pg. 27, L. 25 Through Pg. 30, L. 4 | Conversation regarding production of documents. RJH asserts many letters sent to Harabedian requesting documents that went unanswered. RJH states he was unaware that Mr. Trutanich was also Harabedian's attorney. Both sides agree after RJH sends a written request to Mr. Trutanich, the documents will be sent to him. |
| Pg. 30 L. 5-24 | Admits that to his knowledge, all the monies borrowed by Seagal were repaid to Nasso. Admits speaking to Seagal prior to the deposition but not regarding the fact that he would be deposed. Denies discussing deposition with Marty Singer or Anthony Pellicano. |
| Pg. 31 L. 1- 24 | Admits to knowing Nasso during the time of his divorce, 1996 and admits to speaking to Seagal and Nasso on a regular basis. |
| Pg. 32 thorough Pg. 33, L. 9 | Admits Seagal was a big movie star in 1996 but denies that he spoke more regularly to Nasso regarding the bills than to Seagal when Seagal was really busy. Admits to coping Nasso on communications concerning money that involved Seagal or SteamRoller at Seagal's direction. |
| Pg. 33, L. 10 Through Pg. 34, L.22 | Admits to knowing of expenditures made by Seagal or one of his entities towards a movie called "Cruise" and another one called "Smash and Grab". Denies knowing of any such expenditure for "Genghis Khan." |
| Pg. 34 L. 13-22 | Denies knowing of any posters that refer to Seagal as starring in "Genghis Khan", "Smash and Grab" or "Blood on the Moon". |
| Pg. 34, L. 23 | Denies reading "Variety" and states he does not read "Hollywood Reporter" |

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| Through Pg. 35, L.1 | very often. |
|---|---|
| Pg. 35, L. 2-16 | Denies recalling whether in 1996, he noticed a difference in Nasso's temperament. |
| Pg. 35, L. 13 Through Pg. 36, L.2 | Denies recalling whether Seagal or Emanuel told him that Nasso was suffering some mental and/or emotional problems. Also denies recalling whether Seagal ever indicated that certain producers, directors, agents or managers complained of Nasso going into psychotic rages of screaming, threatening and abusing people. |
| Pg. 36 L. 3-23 | Admits to vaguely recalling an "encounter" that dealt with Nasso's temperament, which allegedly occurred in Florida, but does not recollect ANY facts. |
| Pg. 36, L.24 Through Pg. 38, L.5 | Denies Seagal ever referring to him as part of "his" team.  Denies recollection of telling Seagal he was part of Seagal's team and denies telling Seagal it was bad for Harabedian & Co. to do business with Nasso.  Also denies recollection of being told by Emanuel that it was not good for Seagal to continue doing business with Nasso. |
| Pg. 38 L. 16-25 | Denies having recollection as to whether Nasso was working with Seagal on the movie "Above the Law" or "Hard to Kill."   Also is unsure as to whether he attended the premiere screening of "Hard to Kill" with his partner. |
| Pg. 40 L. 18-21 | Admits to having knowledge that Nasso incurred production credits on some of Seagal's movies. |
| Pg. 40, L. 24 Through Pg. 41, L. 11 | Admits to having knowledge of some complaints by Seagal in regards to the quality of either "Prince of Central Park" or "Not Even the Trees." |
| Pg.41, L. 12 Through Pg. 42, L. 2 | Denies knowing if Seagal was supposed to be the star of a "Prince of Central Park", "Blood on the Moon", "Smash and Grab", and "Ghengis Khan". |
| Pg. 42 L. 3-10 | Admits having knowledge of licensing agreements entered into on behalf of Seagal/Nasso for which money was raised for any of the aforementioned movies. |
| Pg. 43, L. 17 Through Pg. 44, L. 8 | Admits recalling a meeting on or about April 1999 in Seagal's Mandewille ranch in California where Nasso stated he was breaking off his relationship with Seagal. |
| Pg. 44, L. 8 through Pg. 45, L. 23 | Admits Seagal purchased a ranch in Montana and is aware that Nasso later purchased an interest in the ranch via loans Nasso had made to Seagal. |
| Pg. 45, L. 24 through Pg. 46, L. 19 | Denies knowing where the paperwork to relating to the loans made by Nasso to Seagal are located and denies having knowledge of the exact amount of the loans. |
| Pg. 46 L. 20- 25 | Admits in lieu of Seagal paying back the money to Nasso, Seagal gave Nasso an ownership interest in the ranch in Montana. |
| Pg. 47 L. 1-23 | Admits the ranch was sold, denies recalling the percentage of Nasso's ownership interest in the ranch and admits as to records existing that reflect |

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| | said information. RJH requested said records. |
|---|---|
| Pg. 47, L. 24 through Pg. 48, L. 25 | Denies any communication by either Seagal or Nasso expressing concern regarding the sale of the ranch in Montana in 1999. Denies Seagal ever indicating that he didn't trust him (Harabedian). |
| Pg. 50 L. 22-24 | Admits to knowing about the divorce agreement between Seagal and his ex-wife, Kelly LeBrock. |
| Pg. 51, L. 1 through Pg. 52, L. 5 | Denies having knowledge that Nasso had a copy of the papers he (Harabedian) sent to LeBrock's attorney regarding the settlement agreement. |
| Pg. 52 L. 6-12 | Denies telling Seagal that he would have to increase basis for property in Montana so it would appear as if he made less money so he wouldn't have to put money in trust for his two children. |
| Pg. 52, L. 23 Through Pg. 54, L. 9 | Admits to having heard of law firm Freid & Goldsman as representing Seagal in 1995. |
| Pg. 54 L. 10-19 | Denies recalling sending agreement to Nasso in May '95 although recognizes stationary of fax cover. |
| Pg. 55, L. 11 through Pg. 56, L. 7 | Admits to sending Nasso copies of documents. |
| Pg. 56, L. 8 Through Pg. 57, L. 11 | Admits employing Kathy Hampton who still lives in CA and whose primary responsibility was to handle Seagal's account who kept him informed of the documents she sent to Nasso. Denies remembering the dates of employment although he states it would be in the company records, which RJH requested a copy of. |
| Pg. 57, L. 21 Through Pg. 58, L. 15 | Admits that some of Seagal's bills are made to Seagal in care of Harabedian's company and that in Seagal's absence, they would send copies of the bills to Nasso so that he may indicate what and how to pay them. |
| Pg. 59, L. 24 through Pg. 62, L. 23 | Admits to recognizing a transmittal letter, which sends Nasso a copy of Seagal's credit card bill for February 1999 with Seagal's approval. Admits to having no knowledge of any compensation given to Nasso for reviewing the bills. Suggests that maybe Nasso reviewed bills b/c that was the time Seagal/Nasso Films were in operation and some charges may have pertained to said entity. |
| Pg. 62, L. 24 Through Pg. 63, L. 17 | Denies recalling details to transaction regarding the sale of the Montana ranch. Denies knowing whether Seagal kept the percentage of interest attributable to Nasso. |
| Pg. 63, L. 19 Through Pg. 64, L. 4 | Admits sending Nasso information regarding the sale of the Montana ranch. Denies telling Segal that he could decrease his basis or what to declare in profit if he could attribute part of ownership to Nasso. |
| Pg. 64, L. 6 Through Pg. 65, L. 24 | Admits to being present at the closing of the property. Denies being able to recall the cost of the property and the amount for which the property was sold. Denies recollection of RJH's letter requesting said information. RJH marks Exhibit 3, letter dated May 17, 2002. Denies receiving the letter and |

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| | |
|---|---|
| | admits to not sending information b/c he was not instructed to although admits the property at some point involved Nasso. |
| Pg. 65, L. 25 Through Pg. 67, L. 1 | Admits that at the time of the transaction, they sent Nasso the documents he needed for his records.  Admits to not having permission to send RJH the documents.  Denies recalling who did not give the permission, but stated it was Seagal or one of his reps. |
| Pg. 67 L. 2-22 | Admits to NOT sending RJH copies of loan documents from 1990 to present between Seagal and Nasso or related entities.  RJH asks for a copy of those as well as all expenses incurred for "Blood on the Moon", "Genghis Khan", "Prince of Central Park" and "Smash and Grab". |
| Pg. 67, L. 23 Through Pg. 68, L. 23 | Denies recalling the transaction or the loans of the sale of the Montana ranch; denies having knowledge of what was or was not returned to Nasso. Admits knowing that Joe Swindelhurst represented Seagal on the sale of Sun Ranch. |
| Pg. 68, L. 24 Through Pg. 69, L. 7 | Admits to not believing that any money was paid to K. LeBrock as a result of the sale of the Montana ranch. |
| Pg. 69, L. 8 Through Pg. 71, L. 5 | Denies calling Nasso on October 13, 1999 and asking for $500K to pay Seagal's 1998 taxes. Admits to having called Nasso more than once and less than five times to ask for money but denies recalling specifics; although admits having done so at Seagal's direction and without an explanation. Assumes it was to pay Seagal's bills when Seagal was having a shortfall. |
| Pg. 71 L. 7-11 | RJH requests copies of documentation concerning monies that were requested from Nasso or his company, Marine Medical Supply Company. |
| Pg. 71, L. 20 Through Pg. 72, L. 16 | Denies having knowledge as to why he had to call Nasso for money as opposed to Seagal.  Admits monies received by Nasso typically were deposited into on of Seagal's bank accounts and repaid to Nasso out of an account he (Harabedian) was managing for Seagal. |
| Pg. 72 L. 21-25 | Denies recollection of a check sent to Seagal for $40K on or about December 22, 1993.  Denies having recollection of a martial arts settlement in 1993. |
| Pg. 73 L. 1-24 | Denies recollection of Nasso making a loan to Seagal on April 26, 1995 via check from Universal Marine Medical Supply.  RJH introduces Exhibits 4 & 5. |
| Pg. 74 L. 1-13 | Asserts that there must be some verification that if that loan was made, it was paid back b/c he alleges all loans were repaid.  RJH asks for a copy of the verification. |
| Pg. 74, L. 17 Through Pg. 75, L. 22 | Denies recalling whether he called Nasso and asked for $1,500,000  (RJH refers to Exhibit 5, a check for $1,500,000 dated January 23, 1995) or recalling whether he saw those documents.  Asserts that if it was a loan, it was repaid. |
| Pg. 76 L. 3-20 | Admits that cover letter accompanying credit card bill sent to Nasso looks like theirs. |
| Pg. 76, L. 22 Through | Admits complaining to Nasso that Seagal was writing out too many checks to people with Tibetan names and was concerned about Seagal's excessive |

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| | |
|---|---|
| Pg. 77, L. 14 | spending. |
| Pg. 77, L. 15 Through Pg. 78, L. 5 | Denies remembering whether checks were written to a person named Mupukara and Tu-ka and asserts that he believes Rimpochet is a title as opposed to a person. |
| Pg. 78 L. 6-18 | Admits to Seagal using some money to build a temple in Seagal's front yard but denies being aware of any monks that reside in that temple. |
| Pg. 79 L. 2-11 | Admits to recognizing his signature on a check (exhibit 7) for a Martial Arts Settlement. Denies remembering specifics of the matter including whether Nasso paid the $400K for the settlement. |
| Pg. 79 L. 15-21 | Denies recalling whether he discussed with Nasso that INS was complaining there were too many petitions for people from Nepal to come to the US. |
| Pg. 80, L. 2 Through Pg. 81, L. 22 | Denies recalling whether he read article (exhibit 8) that purports to be the business of film dated May 19, 1998 or an advertisement for "The Storytellers" or the article in "The Reporter" dated May 18, 1998 that speaks about Seagal/Nasso and producing the epic "Ghengis Khan with Seagal to star." |
| Pg. 81, L. 23 Through Pg. 82, L. 14 | Admits to recalling "Ghengis Khan" as one of the production projects for Seagal/Nasso Films but denies having information as to whether Seagal was to star in the film. |
| Pg. 82 L. 16-22 | Denies being familiar with the article "Screen International" with an advertisement for Seagal/Nasso on the opposite page. |
| Pg. 82, L. 23 Through Pg. 83, L. 23 | Admits Seagal/Nasso must have paid for the advertisements, but denies having recollection as to whether his company paid for the Seagal/Nasso advertisements. ("The Business of Film," May 14, Friday). RJH requests proof of payment for ads. |
| Pg. 83, L. 24 Through Pg. 84, L. 23 | Denies recalling having seen an ad that says, "Providing the World with Entertainment" or whether his (Harabedian's) company paid for it. |
| Pg. 84, L. 24 Through Pg. 85, L. 19 | Admits that person on ad for "Blood on the Moon" looks like Seagal and denies remembering if Seagal ever complained to him in 1998 or 1999 about Seagal's picture being used without Seagal's permission or in a way that was false or misleading. |
| Pg. 85, L. 20 Through Pg. 86, L. 24 | Admits his office collected money from distributors via wire for presales on several movies but denies knowing who was to star in them. |
| Pg. 86, L. 1-9 | Admits to being unaware of movie stars lending their name to movies in which they did not intend on starring in. |
| Pg. 87, L. 24 Through Pg. 88, L. 21 | Admits recalling that there were pre-production costs for "Gheghis Khan" but denies having knowledge as to whether this movie was ever made and denies having knowledge as to whether money was paid by foreign distributors in anticipation of getting the license for the film. |
| Pg. 88, L. 22 Through Pg. 89, L. 3 | Denies having knowledge that Seagal, at the time of the deposition, was in China planning to make the movie, "Ghenghis Khan" and denies having heard of same. |

Deposition of Robert Harabedian
Tuesday, July 20, 2004
Los Angeles, California

| Pg. 89, L. 4-9 | Denies knowing "Half Past Dead" as a title under Seagal/Nasso Productions. |
| Pg. 89 L. 10-22 | Denies being familiar with article, "Business of Film," dated May 20, Cannes '98 (Seagal's Smash & Grab-three films-Seagal to star) and denies knowing whether Seagal was to star in "Smash & Grab." |
| Pg. 89, L. 23 Through Pg. 90, L. 5 | Denies recalling Emanuel, Seagal, or anyone in the industry indicating that there were false articles concerning movies that Seagal was to star in. |
|  | **END OF VIDEO TAPE NO. 1** |

| | |
|---|---|
| Pg. 90 L. 18-25 | Deposition taken at 3550 Wilshire Boulevard, Suite 840, Los Angeles, California.  Videographer is Jill Warren on behalf of Esquire Deposition Services located at 6222 Wilshire Boulevard, Second Floor, Los Angeles, California. |
| | People present:  Robert Hantman for Nasso, Greg Kerr on behalf of defendants, and Carmen Trutanich for Harabedian. |
| Pg. 91 L. 2-20 | Denies familiarity with the name Danny Provenzano.  Admits to Nasso calling him with concerns regarding Seagal, but not specifically with Seagal hanging out with people from Hoboken, New Jersey. |
| Pg. 91, L. 22 Through Pg. 92, L. 18 | Admits to remembering Nasso's concerns such as Seagal's excessive spending, (which Harabedian shared) and another of Nasso's concerns was in regards to some of the people that were always hanging around the house; Seagal's activity in general but does not recall why Nasso found the people objectionable. |
| Pg. 92, L. 19 Through Pg. 93, L. 15 | Admits to a time when Nasso became disenchanted with the relationship with Seagal and decided to sever it around the latter part of '99 b/c he was unhappy over the order of the films being made by Seagal/Nasso Films. |
| Pg. 93, L. 17 Through Pg. 94, L. 4 | Admits to Nasso severing his relationship with Seagal in December 1999 and denies Seagal indicating to him that Nasso or someone in Nasso's behalf approached him to make movies after that date |
| Pg. 94 L. 5-14 | Denies that Seagal or Emanuel stated that Nasso's mother said it was her dream for Nasso to continue making films with Seagal. |
| Pg. 94, L. 17 Through Pg. 95, L. 16 | Admits knowing that Nasso was involved to some extent in the production of "Above the Law", "Hard to Kill", "Marked for Death" and "Out for Justice." |
| Pg. 95 L. 17-24 | Admits that at the time Seagal introduced Nasso to Harabedian, Seagal stated that Nasso was a long time friend and savvy businessman. |
| Pg. 95, L. 25 Through Pg. 96, L. 5 | Denies Seagal indicating he had a birthday party for Anthony Sarcone. |
| Pg. 96 L. 6-20 | Denies knowing of an American Express bill that Seagal picked up for $1,800.00 |
| Pg. 96, L. 21 Through Pg. 97, L. 3 | Admits Bentley was or is a fund manager called Bentley Capital Management and denies having any affiliation with it. |
| Pg. 97 L. 4-22 | Denies requesting Nasso to put money in it, but admitted mentioning the account to Nasso and Nasso volunteering to put $500K in it but does not recall when.  RJH requests copies of documents.  Admits to believing Nasso made an investment but does not recall when. |
| Pg. 97, L. 23 Through Pg. 98, L. 17 | Denies recalling that Seagal told Harabedian he paid Nasso $700K due to threats.  Admits being told about the $700K payment and has a record of the payment but does not recall specific. (exhibits 9-30). |
| Pg. 98, L. 22 Through Pg. 99, L. 6 | Denies recalling compensation agreement between Seagal & Nasso in 1994 and arrangement for Nasso's producer credits for "Under Siege II." (exhibit 31) |